# Attachment 1

## Page 1

```
            UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS


                Docket No. 3:04-CV-30216-KPN

CARLOS CLAUDIO COTTO,            )
           Plaintiff             )
VS.                              )
                                 )
BERKSHIRE MANUFACTURING CORPORATION, )
           Defendant             )


        DEPOSITION OF CARLOS COTTO, taken
before Debra Vance, Notary Public Stenographer,
pursuant to the provisions of Rule 30 of the
Massachusetts Rules of Civil Procedure, at the
offices of ACCURATE COURT REPORTING, 1500 Main
Street, Springfield, Massachusetts on July 15,
2005, commencing at 10:00 a.m.


APPEARANCES: (See Page 2)




                Debra A. Vance
           Notary Public Stenographer
```

## Page 2

```
FOR THE PLAINTIFF:

HEISLER, FELDMAN & MCCORMICK, P.C.
1145 Main Street, Suite 508
Springfield, Massachusetts 01103
413-788-7988
     BY:  SUZANNE GARROW, ESQ.

FOR THE DEFENDANT:

ROBERT ARONSON
101 State Street
Springfield, Massachusetts 01103
413-733-2600
     BY:  ROBERT ARONSON, ESQ.




ALSO PRESENT:

Otilia Arroyo, Interpreter
Donald Schulz
```

## Page 3

```
                      I N D E X


WITNESS          DIRECT    CROSS    REDIRECT   RECROSS

Carlos Cotto       *6

  * By Mr. Aronson


EXHIBITS    DESCRIPTION                         PAGE

Exhibit 1   Specification 59-1012                60
Exhibit 2   Interrogatories                      63
Exhibit 3   Document typed in Spanish            68
Exhibit 4   Complaint                           158
```

## Page 4

```
                    STIPULATIONS

         It is agreed by and between the
parties that all objections, except objections as
to the form of the questions, and all motions to
strike unresponsive answers are reserved and may
be raised at the time of trial for the first
time.

         It is further agreed by and between
the parties that the sealing and the notification
to all parties of the receipt of the original
deposition transcript is hereby waived.

         OTILIA ARROYA, Interpreter, sworn.

         CARLOS COTTO, Deponent, having been
satisfactorily identified and duly sworn, deposes
and states as follows:

         MR. ARONSON:  Okay.  We'd like
Mr. Cotto to read and sign the deposition.
         And just as a prelude here, what I'd
like to do, at least at the inception of
```

5

1  this deposition, is I'll ask the questions
2  in English. If Mr. Cotto cannot understand
3  the question, then he should say he doesn't
4  understand, and I think that would be "no
5  intenyendo," he could say something like
6  that.
7          If he says he doesn't understand the
8  question in English, then we'll have the
9  translator translate the question into
10 Spanish. Then I'd like Mr. Cotto to try
11 and answer the question in English. If he
12 can't answer the question in English, I'd
13 like him to say so by indicating somehow.
14 And then if he indicates that way, then
15 we'll have the translator -- we'll have
16 Mr. Cotto answer in Spanish and the
17 translator translate.
18         So that's the way we're going to try
19 and proceed. If it gets complicated, then
20 we'll have to try another procedure, but at
21 least initially we'll try it that way.
22 Does everybody understand that?
23         MS. GARROW: I would ask that be
24 translated for Mr. Cotto.

6

1          THE WITNESS: I would like you, the
2  interpreter, to help me, because that way I
3  understand everything in my own language
4  Spanish.
5          MR. ARONSON: Because I'd like to do
6  it this way.
7          MS. GARROW: For the record, there
8  may be portions that Mr. Cotto understands,
9  but to give a full answer, he may ask for a
10 translation and he may indicate as such.
11
12 DIRECT EXAMINATION BY MR. ARONSON:
13 Q.   State your name.
14 A.   Carlos Claudio Cotto.
15         MR. ARONSON: This is not working.
16 I know it's a reaction, but we're going to
17 start again.
18 Q.   (By Mr. Aronson) Would you state your
19 name, please?
20 A.   Carlos Claudio Cotto.
21 Q.   Would you please speak up?
22 A.   I don't understand (in English).
23 Q.   Carlos Claudio Cotto?
24         MS. GARROW: For the record, he

7

1  answered that question, I think, with the
2  portion he asked to be translated which you
3  can read back if you would like.
4          MR. ARONSON: I would just like to
5  note that Ms. Fuentes is translating also
6  when Ms. Garrow says something. But we're
7  not going through that exercise at the
8  beginning of the deposition for that.
9  Q.   (By Mr. Aronson) How old are you,
10 Mr. Cotto?
11 A.   Thirty-eight (in English).
12 Q.   And are you married?
13 A.   No (in English).
14 Q.   And do you have any children?
15 A.   Two.
16 Q.   What are their names?
17 A.   Benjamin Claudio and Carlos Claudio
18 (in English).
19 Q.   So you have two sons?
20 A.   They're really my nephews, but I have
21 always raised them because my brother just
22 disappeared on us. He disappeared. I know
23 nothing of him. So to them, it's like I'm their
24 father.

8

1          MR. ARONSON: Off the record.
2          (Off record discussion)
3          MR. ARONSON: As I understand it,
4  the way this transcript is going to read is
5  if Mr. Cotto answers in English, you will
6  indicate that it's being answered in
7  English. If there's no such indication,
8  then the transcript -- or we will assume
9  that Mr. Cotto has answered in Spanish and
10 the interpreter has translated it into
11 English.
12         MS. GARROW: I will just add, for
13 the record, there have already been
14 occasions where, because of the tone, it's
15 been difficult to understand him even
16 answering in English so that may not hold
17 true, and I will so indicate as we go
18 along.
19         MR. ARONSON: That's good.
20 Q.   (By Mr. Aronson) Do you have any
21 children, Mr. Cotto?
22         MS. GARROW: Objection. You can
23 answer.
24         THE WITNESS: What was the question?

Accurate Court Reporting    1500 Main Street, Suite 1412    Springfield, MA 01115    413-747-1806

## Page 29

1  MS. GARROW: Objection.
2  Q. (By Mr. Aronson) Let me ask a
3  different question.
4  Did Roberta answer you in Spanish or
5  English?
6  A. English (in English).
7  Q. What did she say in English?
8  A. I don't have nothing now (in
9  English).
10 Q. Did she say anything else?
11 A. I don't understand (in English).
12 No, nothing else, and hang up and
13 that's it.
14 Q. How long was the telephone call?
15 A. I don't understand (in English).
16 For one minute, even less.
17 Q. When was the next time you called
18 Roberta?
19 A. I don't understand (in English).
20 After that, the next time was the
21 week after that, the following week.
22 Q. What did you say to her at that time?
23 A. I don't understand (in English).
24 The same thing.

## Page 30

1  Q. What did she say in response?
2  A. No got nothing right now (in
3  English).
4  Q. Was this telephone conversation also
5  less than a minute in length?
6  A. I don't understand (in English).
7  Yes. Every time that I called her,
8  that's the only thing that I ever asked, and she
9  would just say no there's nothing and hang up.
10 Q. There was a third time you called
11 her. When was that?
12 A. I don't understand (in English).
13 She would tell me to call her every
14 week, once per week.
15 Q. Did she tell you in English or
16 Spanish?
17 A. I don't understand (in English).
18 She would tell me in English.
19 Q. Did you call her a third time?
20 A. I don't understand (in English).
21 Yes.
22 Q. When?
23 A. I don't understand (in English).
24 Well, the third week I was already

## Page 31

1  out.
2  Q. Did you call her after that?
3  A. I don't understand (in English).
4  After that, then I was just kind of
5  like just waiting for her to be the one calling
6  me.
7  Q. Why didn't you call her?
8  A. Because she was supposed to have
9  called me.
10 THE INTERPRETER: I apologize,
11 Counsel. For the interpreter it's a little
12 tough, because the process that the
13 interpreter is used to following in a
14 deposition is completely different. It's
15 questions and answers.
16 MR. ARONSON: Don't worry about it.
17 Q. (By Mr. Aronson) You indicated that
18 she was supposed to call you. When did she say
19 that, if she did?
20 A. I don't understand (in English).
21 No, she never called me.
22 Q. You indicated in your testimony it
23 was your understanding that she was supposed to
24 call you. Why did you have that understanding or

## Page 32

1  did you?
2  A. I don't understand (in English).
3  Only she knows why she didn't call
4  me.
5  Q. It was my understanding, and correct
6  me if I'm wrong, you called Roberta three times
7  after you were laid off in November of 2003 to
8  find out if there was any work. And on each
9  occasion she said no and then you stopped
10 calling. Then it was my understanding you said
11 she was supposed to call you. And my question
12 is, why did you think that after three weeks she
13 was supposed to call you as supposed to you
14 calling her?
15 A. I don't understand (in English).
16 She was supposed to call me. And
17 then the week after, the fourth week after, that
18 was when I saw the ad in the newspaper they were
19 hiring someone for the same position that I was
20 employed at. And so then I called and I said,
21 "Well, do you have anything for me," and she
22 said, "No, no, I don't have anything for you."
23 Q. Did Roberta ever tell you that she
24 would call you if there was any work at Berkshire

57

Q. For how many years have you studied English?
A. I don't understand (in English).
How many years I studied it? Well, I started to study English in, I believe that we started to get English class from third grade.
Q. And you continued studying English from third grade through high school; is that right?
A. I don't understand (in English).
Yes. We would only get one class in English.
Q. How many hours a week did you study English in the third grade?
A. I don't understand (in English).
They would teach maybe like for one hour, but in that hour if they spoke 15 minutes of English that would be more than enough.
Q. Did you study how to speak English?
A. I don't understand (in English).
No.
Q. Did you study how to understand spoken English?
A. I don't understand (in English).

58

No, that either. The little bit that I do understand I learned in here, out in the street.
Q. Once you got to the United States?
A. Yes.
Q. Did you study learning how to write English?
A. I don't understand (in English).
No, I did not study that.
Q. Did you study how to read English?
A. I did for reading but, I mean, not much.
Q. So the last course you took in English was in 1986 or so; is that right?
A. I don't understand (in English).
In '86.
Q. And the answer is yes?
A. Yes. The last course that I took in English was in '86.
Q. And on a scale of 1 to 10, 1 being the worst and 10 being the best, how well can you understand spoken English as of November 2003?
MS. GARROW: Objection.
THE WITNESS: I don't understand (in

59

English).
Maybe a 7 or so. I understand it pretty much. It's just that I don't know how to express myself.
Q. (By Mr. Aronson) On a scale of 1 to 10 with 1 being the worst and 10 being the best, how well did you speak English as of November of 2003?
A. I don't understand (in English).
Speak it? I can speak it a little bit, not very well. I understand it pretty much but not to speak it. I fear that people may laugh at me.
Q. On a scale of 1 to 10 with 1 being the worst and 10 being the best, how well could you read English as of November of 2003?
A. Read it? In order to read it, I do understand it pretty much. Pretty good, because I did fill out job applications and I filled those out myself.
Q. On a scale of 1 to 10 with 1 being the least and 10 being the best, how well could you read English in November of 2003?
A. I would say about a 9. Are you going

60

to have me read? Now I'm not going read.
MR. ARONSON: I'll mark as Exhibit 1 a document that's entitled "Specification No. 59-1012."
(Exhibit 1 marked)
Q. (By Mr. Aronson) Look at Exhibit 1, Mr. Cotto. Have you seen Exhibit 1 before?
A. I don't understand (in English).
I don't understand it. I don't know what this is. No, I have never seen that. I don't know what it is.
Q. Would you please read in English the paragraph starting "viewing procedure" followed by paragraphs 1, 2, and 3, just read it in English, please?
A. I don't understand (in English).
I'm going to read all this?
Q. Yes, please.
A. I know how to read to myself, not to read like that for everyone. I understand when I read to myself. And I understand in order to fill out the job application, but things like that, I do not understand.
Q. Can you read this into the record in

61

English starting with "viewing procedure"?
   MS. GARROW: Objection.
   THE WITNESS: I don't understand (in English).
   I cannot. I cannot read that.
   Q. (By Mr. Aronson) In English?
   A. I can read it for myself, but to read it like that so that everyone can understand it, no, no, no, I cannot.
   Q. Look at paragraph 3 on Exhibit 1, paragraph No. 3. It says, it starts with "All surfaces should be viewed for a total of approximately 8 seconds."
   Do you see that, Mr. Cotto?
   MS. GARROW: You mean under the fourth section here?
   MR. ARONSON: Under viewing procedures.
   Q. (By Mr. Aronson) Just tell me -- read paragraph 3, please, and tell me what it means.
   A. What does that mean?
   Q. Yes.
   A. It's talking about eight seconds. It says something about -- it must be about those

62

parts.
   Q. What does paragraph No. 3 refer to, Mr. Cotto?
   A. I don't understand (in English).
   I don't know. It's something about eight seconds. I don't know what it's about.
   Q. Do you have any idea what it refers to? You can look at the entire document, by the way.
   MS. GARROW: Objection. It's been asked and answered.
   Q. (By Mr. Aronson) What's paragraph 3 refer to, what's it talking about?
   MS. GARROW: Objection. Asked and answered.
   THE WITNESS: I don't understand (in English).
   I don't know. I know it's saying something about eight seconds, but I don't know what the heck and what the hell it is about and about inspections, "inspectioning." I'm nervous if I was to kind of like read it, but I'm nervous.
   Q. (By Mr. Aronson) Take your time,

63

Mr. Cotto. Take as much time to read paragraph 3. And then if you can read it, read it into the record.
   A. No, I can not read it in English. Go ahead with what other things you have. I can't do that. They don't have you there read so that I may have to be reading in here.
   MR. ARONSON: I'll mark as Exhibit 2 a copy of Plaintiff's Response to Defendant's Interrogatories.
   (Exhibit 2 marked)
   MR. ARONSON: I'll note for the record that it's the supplemental ones, the ones that were done after the initial ones.
   MS. GARROW: Okay.
   Q. (By Mr. Aronson) Have you ever seen this document before, Exhibit 2?
   A. I don't understand (in English).
   No, I have not seen this.
   Q. Look on the first page, Mr. Cotto. There's a paragraph that begins with "As allowed by Federal Rule." And what I'd like you to do is read that entire paragraph out loud in English.
   A. I don't understand (in English).

64

   MS. GARROW: I object. This was done with Mr. Cotto and his attorney, and we worked on these together. So he may not be able to identify the specific language. You can answer the question.
   THE WITNESS: I don't understand (in English).
   What was question that was just placed?
   Q. (By Mr. Aronson) I'm going to point to a paragraph here. It starts with "As allowed by Federal Rule of Procedure." And I'm just asking you to read that paragraph out loud in English on page 1 of exhibit 2.
   A. You want me to read that?
   Q. Please.
   A. I'll read wrong into it.
   Q. Please read it, if you can.
   A. No, I cannot read. I cannot. I will read it to myself. I am reading it to myself.
   MS. GARROW: I'm going to take a break.
   MR. ARONSON: I'm in the middle if you wouldn't mind waiting one more

65

1 question.
2 MS. GARROW: One more question is
3 fine.
4 Q. (By Mr. Aronson) Please read it to
5 yourself and then explain it to me on the record
6 in English, if you can.
7 A. I don't understand (in English).
8 It talks about the department of
9 discrimination and employer opportunity
10 commissions. That's the only thing that I'm able
11 to say well about it.
12 Q. Do you know what it's saying about
13 those?
14 A. I don't understand (in English).
15 No. When I get letters like that at
16 home, I just have my daughter read them.
17 Q. Your stepdaughter, Elizabeth?
18 A. Uh-huh, yes.
19 Q. Look, if you would, on page 3 of
20 Exhibit 2, and this paragraph D. Do you see
21 that?
22 A. This one here?
23 Q. Yes.
24 A. Yes.

66

1 Q. There's a paragraph below that, do
2 you see that? It starts with "I had been
3 performing." Do you see that?
4 A. Uh-huh.
5 Q. Would you read that in English,
6 please, out loud?
7 A. If I didn't read the others, I'm
8 going to read this one?
9 Q. Can you read it out loud in English?
10 A. I cannot read it out loud.
11 Q. Would you read it to yourself and
12 then tell me in English what it says, please?
13 A. I don't understand. I don't
14 understand.
15 Q. Can you understand what that says by
16 reading it to yourself, paragraph D on page 36 to
17 Exhibit 2 starting with "I had been performing"?
18 MS. GARROW: Objection. Asked and
19 answered.
20 THE WITNESS: I already said I
21 cannot read it.
22 Q. (By Mr. Aronson) I'm not asking you to
23 read it out loud. I'm asking you to read it to
24 yourself.

67

1 MS. GARROW: Objection. Asked and
2 answered.
3 THE WITNESS: No, I cannot. I don't
4 know. I cannot read it.
5 MR. ARONSON: Just for the record,
6 what I've asked Mr. Cotto to read is the
7 following: "I had been performing the same
8 tasks at Berkshire since I was hired and
9 when I was fired in November 2003.
10 Positions with those tasks have been open
11 since I was fired from Berkshire.
12 Mr. Schultz acknowledged that I was 'a good
13 worker good attendant.'"
14 That's an answer that Mr. Cotto gave
15 to an interrogatory posed to him in this
16 case.
17 THE INTERPRETER: Did counsel wish
18 for the interpreter to interpret that
19 reading?
20 MS. GARROW: No. Could you please
21 translate that, though, so that he
22 understands?
23 (A lunch recess was taken at 12:08
24 p.m.)

68

1 (Back on the record at 12:47 p.m.)
2 (Exhibit 3 marked)
3 Q. (By Mr. Aronson) Mr. Cotto, I've
4 marked as Exhibit 3 a document that's got a
5 number on it B47 and what goes with it is a blank
6 sheet of paper. Have you ever seen the first
7 page of Exhibit 3?
8 A. I don't understand (in English).
9 It has my signature, so I guess I've
10 seen it before.
11 Q. Now, can you translate into English
12 the first two paragraphs of the first page of
13 Exhibit 3?
14 A. I don't understand (in English).
15 Where at?
16 Q. The first two paragraphs, just read
17 what they say and tell me what they say in
18 English.
19 A. I'm not able to explain it myself in
20 English.
21 Q. Can you translate it?
22 A. Not to English.
23 Q. Can you write in English on the
24 second page of Exhibit 3 what is set forth in the

# Attachment 2

## 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-30216-KPN

CARLOS CLAUDIO COTTO
    Plaintiff

vs

BERKSHIRE MANUFACTURING CORP.
    Defendant

DEPOSITION OF ROBERTA DESJARDINS

July 8, 2005, 10:00

Heisler, Feldman and McCormick

1145 Main Street

Springfield, Massachusetts

Ann A. Preston
Certified Shorthand Reporter

## 2

APPEARANCES

HEISLER, FELDMAN AND MCCORMICK
1145 Main Street
Springfield, MA  01103
BY:  SUZANNE GARROW, ESQ.
(413) 788-7988
Representing the Plaintiff

LAW OFFICE OF ROBERT ARONSON
101 State Street
Springfield, MA  01103
BY:  ROBERT ARONSON, ESQ.
(413) 733-2600
Representing the Defendant

In Attendance:

Donald Schulz

## 3

I N D E X

WITNESS:  ROBERTA DESJARDINS

Direct Examination by Ms. Garrow    5

EXHIBITS

Exhibit 1, Order Confirmation    63
Exhibit 2, Newspaper Ad    66
Exhibit 3, Policy Excerpt    69
Exhibit 4, 12/1/03 Fax Form    84

## 4

   1                       STIPULATION
   2
   3      It is agreed by and between the parties
   4  that all objections, except as to form of the
   5  question, are reserved until the time of trial.
   6
   7      It is further agreed by and between the
   8  parties that all motions to strike unresponsive
   9  answers are reserved until the time of trial.
  10
  11      It is further agreed by and between the
  12  parties that the sealing of the original
  13  deposition transcript is hereby waived.
  14
  15      It is further agreed by and between the
  16  parties that the notification to all parties of
  17  the receipt of the original deposition
  18  transcript is hereby waived.
  19
  20
  21
  22
  23
  24

101

1   A.   I don't think so.
2   Q.   When I say the end of 2003, I mean
3   from November 2003 on.  Is your answer the same?
4   A.   Pretty much, yes.
5   Q.   When you say "pretty much," what's
6   different -- what would you change, if anything?
7   A.   Some packaging jobs have stayed the
8   same, but some haven't.
9   Q.   What's changed?
10  A.   Sometimes the customer will request,
11  you know, different packaging.
12  Q.   So the changes would be in what the
13  customer requested?
14  A.   Yes.
15  Q.   In the type of packaging that is done?
16  A.   Yes.
17  Q.   Has what customers have asked for
18  changed since November 2003?
19  A.   I can't tell you offhand.
20  Q.   Do you know how many --
21  A.   We have a lot of customers.  I can't
22  tell you.  I don't know.
23  Q.   So do you have a specific recollection
24  that anything changed since November 2003 in

102

1   relation to packaging?
2   A.   Well, some customers will say they
3   want more bubble pack, or they'll say, you know,
4   wrap each part separately.  You know.
5   Q.   You don't know when that occurred?
6   A.   No.
7   Q.   How would you communicate that to your
8   people who worked for you in packing?
9   A.   I'd tell them.  Or I write it on a
10  card when I write instructions out.  We have
11  where we put notes on the cartons what's got to
12  be done.
13  Q.   So you make a note on the carton?
14  A.   Sometimes.  Not every time, but
15  sometimes.
16  Q.   How often do you do that?
17  A.   When the customer requires something
18  special.
19  Q.   So that how often is that?
20  A.   I don't know exactly.
21  Q.   Do you do it once a day, once a month,
22  once a year -- any of those sound like it's close
23  in number -- just can't say?
24  A.   It's hard to answer.  I just can't

103

1   answer it.
2   Q.   But you said you also communicate any
3   changes verbally as well.  Do you do that?
4   A.   Yes.
5   Q.   Is that the same with plating; if
6   there are changes in the plating, do you
7   communicate verbally with folks?
8   A.   Verbally and written.
9   Q.   What do you write these instructions
10  on?
11  A.   Sometimes just the rack that the
12  plater's taking.  It might be that particular
13  rack has some mixed metals on it, so you have to
14  plate it a totally different way than they would
15  ordinarily think that they had to plate it.  Like
16  if they had a brass piece and they were plating
17  but yet it had some other metal on there, they
18  would have to plate it different.
19  Q.   If they had --
20  A.   If they didn't plate it that way, they
21  could mess it up.
22  Q.   If they see those instructions, do
23  they sometimes come to you and ask for
24  clarification?

104

1   A.   No, because we usually -- I mean, I
2   suppose it's happened, but we usually try to
3   explain pretty good on them.  And they're used to
4   our writing the instructions, so they pretty much
5   know what we mean when we write it.
6   Q.   But you do communicate verbally as
7   well to platers?
8   A.   Yes.
9   Q.   On a regular basis?
10  A.   Yes.
11  Q.   Daily?
12  A.   Yes.
13  Q.   Many times daily?
14  A.   Yes.
15  Q.   Have you ever had anybody tell you
16  that they are unwilling to translate for
17  Mr. Cotto?
18  A.   I don't believe so.
19       MS. GARROW:  I have nothing
20  further.
21       MR. ARONSON:  I have no questions
22  at this time.  Thank you.
23
24       (Deposition concluded at 12:20)

# Attachment 3

# Berkshire Manufacturing
175 Progress Ave. • Springfield, MA 01104 • (413) 736-5490 • Fax (413) 781-5922



EXHIBIT
#2 SCHULZ
7-1-05

March 29, 2004

The Commonwealth of Massachusetts
Commission Against Discrimination
436 Dwight Street
Room 220
Springfield, MA 01103

Attention: Karen Dome

Re: Carlos Claudio Cotto vs. Berkshire Manufacturing Company
    MCAD Docket Number: 04SEM00525

Dear Ms Dome:

   Berkshire Manufacturing does not discriminate in its hiring practices because of race, color, sex, age or religion, our only criteria is willingness to work and ability to learn or do the job.

   The percentage of Spanish production workers is currently 50% and it ranges from 50% to 90%. A couple of the workers are over 65 and the General Manager is a woman. There is statistically nothing to support a case of any kind of discrimination.

   In the case of Mr. Cotto, Berkshire acknowledges that he was a good worker with good attendance. The problem was in his lack of English. The work that Berkshire does is changing rapidly and is now more technical and precise with a higher demand on being able to communicate rapidly and effectively. Berkshire has just completed a move into a completely new area of the building with hopes of being able to compete in a very difficult environment. If we can find work for Carlos in the future we will do so. However, there are no guarantees. We have no animosity toward Carlos and applaud his desire to work and support his family.

   Berkshire lays off employees by seniority, whenever possible, however, ultimately bases its decision on the needs of the company.

If you have any questions, or need clarification, please do not hesitate to contact me.

Very truly yours,

BERKSHIRE MANUFACTURING CORPORATION

*Donald Schulz*

Donald Schulz
President

Cc: Carlos H. Claudio Cotto
5 Vernon Street
Holyoke, MA 01040

*Helena Casimiro*

HELENA CASIMIRO
Notary Public
Commonwealth of Massachusetts
My Commission Expires Mar 13, 2009