UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-30216-KPN

_____
                                                    :
CARLOS CLAUDIO COTTO,                               :
                                                    :
                              Plaintiff,            :
                                                    :
                   v.                               :
                                                    :
BERKSHIRE MANUFACTURING CORPORATION,                :
                                                    :
                              Defendant.            :
_____ :


**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**


Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1,

defendant Berkshire Manufacturing Corporation ("Berkshire") respectfully submits this

Memorandum of Law, together with the accompanying affidavit of Donald J. Schulz

("Schulz") ("Schulz Affidavit") and Defendant's Statement Of Material Facts With Re-

spect To Which There Is No Genuine Issue To Be Tried, in support of its motion for

summary judgment.


**<u>PRELIMINARY STATEMENT</u>**


Plaintiff Carlos Claudio Cotto ("Cotto") filed a charge with the Massachusetts

Commission Against Discrimination ("MCAD") on or about March 10, 2004 alleging

(among other things) that Berkshire had discriminated against him based upon (his) "Hispanic" (national origin), and the MCAD charge was transmitted to the United States Equal Employment Opportunity Commission ("EEOC") on or about April 22, 2004.  In response to Cotto's request, the MCAD dismissed Cotto's complaint on May 6, 2004, and on August 20, 2004 the EEOC issued a "Notice Of Right To Sue".

On or about November 4, 2004, Cotto commenced this action.  In his complaint (Exhibit A in the Exhibit Appendix[1]), Cotto alleges that Berkshire discriminated against him (only) on the basis of his national origin in violation of Title VII of the 1964 Civil Rights Act (42 U.S.C. §2000e-2(a)(1)) and M.G.L. c. 151B, §§4(1) and (16A)[2], and seeks the award of injunctive relief, compensatory and punitive damages, reasonable attorneys fees and litigation costs.  In its January 7, 2005 answer (Exhibit B in the Exhibit Appendix), Berkshire denied the operative allegations in Cotto's complaint (including any discrimination against Cotto on the basis of his national origin or otherwise) and asserted various affirmative defenses.

## FACTUAL BACKGROUND

## BERKSHIRE MANUFACTURING CORPORATION:

Berkshire was formed by Schulz in or about 1983 and, since that time, Schulz has been the president and chief operating officer of Berkshire.  Since July 1997 (when Cotto was first hired (infra)), Berkshire has been engaged only in the business of provid-

---

[1] Because some of the exhibits in connection with this motion are photographs, an Exhibit Appendix is being served and filed by mail, rather than electronically.

[2] Since M.G.L. c.151B, §4(16A), concerns the sexual harassment of an employee, it has been assumed that Cotto's reference to that section in his complaint was a typographical error.

ing electro-chemical plating and finishing services on various fabricated metal parts (such as automotive, plumbing and electrical parts, scientific instruments, printed circuits, medical and optical devices and general industrial parts) which are received from its customers.

Berkshire is a small "job shop". While Berkshire has had repeat customers (infra), to a large extent the amount of work at Berkshire at any given time depends upon the number of customers, and the number of parts of each customer, for which Berkshire is performing plating services. A specific job for a customer at Berkshire may consist of plating from only 1 to as many as hundreds of parts, and the plating of a customer's part(s) may take from just 1 hour to a number of weeks. Although large variations occur, on average Berkshire performs plating services for approximately 100-200 different customers (parts) each week.

During the period from July 1997 to the present, Berkshire has been managed and supervised primarily by Schulz and Roberta Desjardins ("Desjardins") who have over 40 and 25 years (respectively) of industrial shop experience. Schulz and Desjardins, together with 2 or 3 (depending upon the time period) forepersons, are responsible for instructing employees with respect to how to perform the work at Berkshire. Neither Schulz, Desjardins or the forepersons at Berkshire speak or understand Spanish.

Since 1997 Berkshire has, depending upon the amount of available work, had between 11 and 21 employees.[3] Between 40 and 80% of the individuals employed by Berkshire at any given time during the period from 1997 to date were of Hispanic origin.

---

[3] The current number of Berkshire employees is less than it was in November 2003 when Cotto was laid off (infra).

**RACKING, PLATING AND UNRACKING PROCEDURES AT BERKSHIRE**:

The procedures performed by Berkshire with respect to the plating of metal parts are complex, have demanding quality standards (and thus are reject prone) and vary significantly depending upon the nature of the hundreds of different parts which are being plated.

Generally, the parts are first buffed or polished on a polishing/buffing wheel with abrasive compounds for the purpose of insuring that the surface of the part is smooth and burr-free.  Once polished/buffed, between 1 and 300 parts are "racked" or attached (fixtured) to a metal, plastisol (PVC) covered plating rack in a specific manner depending upon the type of parts which are being plated and the specific plating procedure which must be followed (photographs of typical plating racks used at Berkshire are contained in the Exhibit Appendix as Exhibit C).  The plating racks are then immersed by hand in a specified sequence of from 5 to 125 different (sometimes electrified) tanks (a picture of a portion of the plating tank area at Berkshire is contained in the Exhibit Appendix as Exhibit D) which are approximately 3 feet wide, 3-6 feet long and 4 feet deep and contain sometimes hazardous and/or poisonous chemicals (such as sulfuric acid, hydrochloric acid, nitric acid, hydroflouric acid, potassium cyanide, sodium cyanide, chromic acid and/or sodium hydroxide) for the purpose of first cleaning and then coating (plating) the racked parts with a specified metal (such as gold, silver, nickel, tin, copper, zinc or chrome).  After they have been plated the parts are removed from the rack (unracked), inspected, counted, allocated to a customer's order and shipped to the customer.  The entire racking, plating and unracking procedure usually takes from 1 to 3 hours depending upon the number of tanks involved.

By way of example, the following is the procedure for the initial <u>racking</u> of an aluminum motorcycle transmission housing with bronze bushings which Berkshire plated with copper and then chrome (a job involving approximately 30 - 50 parts which Berkshire performed approximately 2 times a year):  initially inspect the housing to in-sure it is properly polished and complies with polishing standards; insert 2 #5 neoprene plugs on both ends of the bushing plug 5/16 hole in the flat face; insert a red neoprene plug in a tapped hole used for oil fill; insert a 5/16 white pull plug in a 5/16 tapped hole in the flange; insert a tapered white silicon plug in the fine threaded side hole; locate a 6-piece rack for plating; adjust the prongs on the rack to insure they can accommodate the housing; fixture the housings on the rack with the fill hole facing the anodes in a ver-tical direction; and insure that the housings are aligned on the rack so they will not fall off.

In connection with the racking of the transmission housings (and other parts) employees must be given oral instructions[4] with respect to (among numerous other things) the manner for:  selecting the correct rack (from hundreds of different racks) and insuring that the rack is not damaged; determining whether the rack must be stripped or cleaned of chemicals from the last job on which it was used and, if required, the method for cleaning the rack; plugging or masking areas of the parts to be fixtured on the rack which are not to be plated; placing the parts on the rack; determining the number of parts which may be placed on the rack; and determining whether there are any bad con-tacts on the racks.

Once it has been racked, the following is the (42 step) sequence of the specific

---

[4] Although written instructions may be utilized, in most cases the instructions with respect to the rack-ing, plating and unracking procedures are orally given to employees.

tanks into which the transmission housing must be immersed in connection with the
<u>copper</u> <u>plating</u> of the housing:  ultrasonic cleaning tank with 2 generators for 2 minutes;
rinse (water) tank for 10 seconds; aluminum soak tank for 2 minutes (insuring the tank
temperature is 140 degrees F); rinse (water) tank for 10 seconds (insuring the surface
of the housing is water break (bead) free and if not, immersing the parts in the alumi-
num soak tank for another 2 minutes); hot sulfuric acid tank for 1-1/2 minutes (insuring
the tank temperature is 135 degrees F) until vigorous gassing occurs; nitric hydroflouric
acid tank (insuring that not too much hot sulfuric acid is dragged out); nitric hydroflouric
acid tank for 10 seconds (insuring that the housing has a white appearance); rinse (wa-
ter) tank for 10 seconds; rinse (water) tank for 10 seconds; nitric hydroflouric tank for 15
seconds; rinse (water) tank for 10 seconds; rinse (water) tank for 5 seconds; zincate so-
lution tank for 45 seconds (insuring that the tank temperature is 85 degrees F and that
the housing has a gray appearance); rinse (water) tank for 15 seconds; rinse (water)
tank for 10 seconds; rinse (water) tank for 10 seconds; rinse (water) tank for 5 seconds;
rinse (water) tank for 3 seconds; nickel solution tank (other than the Dur-nickel or Tri-
nickel tanks) for 15 minutes at 40 amperes per square foot of surface area; rinse (water)
tank for 10 seconds; rinse (water) tank for 8 seconds; rinse (water) tank for 6 seconds;
rinse (water) tank for 3 seconds; rinse (water) tank for 3 seconds; rinse (water) tank for
3 seconds; hydrochloric acid tank for 10 seconds; rinse (water) tank for 10 seconds;
rinse (water) tank for 5 seconds; copper cyanide solution tank for 30 seconds at 4 volts;
rinse (water) tank for 10 seconds; rinse (water) tank for 5 seconds; rinse (water) tank for
10 seconds; acid copper tank for 2-1/2 to 3 hours at 40 amperes per square foot of sur-
face area; rinse (water) tank for 5 seconds; rinse (water) tank for 5 seconds; hot water

tank for 5 seconds; hot water tank for 5 seconds; hot water tank for 5 seconds; de-ionized water rinse tank for 3 seconds; de-ionized water rinse tank for 3 seconds; de-ionized water rinse tank for 3 seconds; de-ionized water rinse tank for 3 seconds; and then insertion into enclosed drying tank.

After they have been copper plated, the housings must be unracked, the plugs removed and the housings again polished to eliminate any surface defects.  The housings must then be re-plugged and re-racked (supra) and immersed in the following (33 step) sequence of specific tanks in connection with the chrome plating of the housings: ultrasonic cleaning tank with 2 generators for 3 minutes; rinse (water) tank for 3 seconds; aluminum soak tank for 2 minutes (insuring the tank temperature is 140 degrees F); direct current clean tank for 1 minute; reverse current clean tank for 1 minute; rinse (water) tank for 5 seconds; rinse (water) tank for 5 seconds; brass acid tank for 15 seconds; rinse (water) tank for 5 seconds; rinse (water) tank for 5 seconds; duplex nickel solution tank for 30 minutes; TriNi nickel solution tank for 1 minute; bright nickel solution tank for 20 minutes; DurNi solution tank for 1-1/2 minutes; rinse (water) tank for 5 seconds; rinse (water) tank for 5 seconds; rinse (water) tank for 5 seconds; rinse (water) tank for 5 seconds; rinse (water) tank for 5 seconds; nickel activate tank for 20 seconds; chrome tank for 3 minutes; dragout tank for 10 seconds; rinse (water) tank for 5 seconds; rinse (water) tank for 5 seconds; rinse (water) tank for 5 seconds; hot water tank for 3 seconds; hot water tank for 3 seconds; hot water tank for 3 seconds; de-ionized water rinse tank for 3 seconds; de-ionized water rinse tank for 5 seconds; de-ionized water rinse tank for 4 seconds; de-ionized water rinse tank for 3 seconds; and then insertion into an enclosed drying tank.

In connection with the plating of the transmission housings (and other parts) in-
structions must be given to employees regarding (among numerous other things):  the
correct tank sequence for the plating; the manner for determining whether the tempera-
ture, PH, bipolar conditions and the electrical current density of the plating tanks are
correct; the length of time the parts should be immersed in each tank; the length of time
between immersion of the parts in the tanks; the manner for determining if there are wa-
ter breaks on the parts after rinsing; the manner for insuring that parts do not touch the
sides of the tanks; the method for tilting the racks if there is a cupping problem; the
manner for insuring the racks are properly drained to avoid contaminating subsequent
tanks with chemicals; the manner for insuring the tanks are clean and the rinse flow is
functioning properly; the manner for determining if there is smutt (powder residue) on
the parts; the manner for insuring the cathode bars are clean; the method for and cir-
cumstances under which chemicals must (or cannot) be added to the tanks; the manner
for insuring the tank solutions are at the proper level; the manner for insuring that there
are no bad contacts on the rack; the manner for determining and planning for tank
availability; and the manner for monitoring the pitting and roughness of a part.

Finally, in connection with the unracking of the transmission housings (and other
parts) employees must be given instructions with respect to (among numerous other
things) the manner for:  removing a part from the rack to avoid damaging the part; test-
ing a part with threaded holes to insure that there is no residue on the threads and that
the threads have not been overplated; removing excess residue on the parts when the
plugs are removed; insuring that all areas of the part are plated; insuring that areas
which have been plugged have not been plated; determining the proper brightness level

of the part; insuring that the part has the proper plating adhesion; and inspecting the part to insure it complies with the customer's specifications and has the correct appearance.

In addition, because of, and depending upon, the complexity and variability of the racking, plating and unracking procedures, there are a multitude of issues which arise throughout the day with respect to the procedures which are not included in the initial instructions. Consequently, Schulz, Desjardins and the forepersons at Berkshire must constantly monitor the employees who are performing the procedures and continuously give them additional, supplemental instructions and assistance regarding (among numerous other things) how to avoid problems with respect to the procedures, the manner for correcting any problems which do occur and how to avoid being injured during the procedures.

If the instructions with respect to the racking, plating and unracking procedures are not precisely followed, the plated part will not meet the quality standards of, and therefore can not be shipped to, the customer. In some cases a defectively plated part must be discarded and Berkshire must pay the customer for the discarded part. Alternatively, if it is possible to salvage the part, Berkshire must then incur the substantial costs of stripping, and again racking, plating and unracking, the part, before it can be returned to the customer. In addition, if the instructions regarding the proper sequence and procedure for the plating of a part are not correctly followed, it is possible that the employee who is performing the plating can be burned either by the heat of or the acids contained in the plating tanks. Consequently, it is critical to the safe and efficient operation of Berkshire's business that Berkshire's employees strictly adhere to the instruc-

tions relating to the specific procedures for racking, plating and unracking of metal parts.

**COTTO'S EMPLOYMENT FROM
<u>JULY 1997 TO NOVEMBER 2003</u>:**

Although he had no prior experience, Cotto was hired on a full time basis by Berkshire on July 17, 1997 at the suggestion of another Berkshire employee exclusively for the purpose of racking and unracking one (1) specific stainless steel part for an automobile headlight ("lightshield") for the Eaton Corporation which were chrome-plated by Berkshire.  At that time approximately 30 - 40% of Berkshire's business was attributable to the plating of lightshields for Eaton.

Cotto was (and is) not able to understand oral (or written) instructions in English with respect to the procedures for racking and unracking parts (much less with respect to plating).  When he was hired, Schulz, Desjardins and the forepersons were, with the assistance of other bilingual employees at Berkshire, able to instruct Cotto on the procedures for racking and unracking the Eaton lightshields because the procedures were relatively simple.  In addition, once Cotto learned the instructions, he did not have to be given any further instructions because the racking/unracking procedures for the Eaton lightshields did not change and Cotto could merely follow the same instructions he had learned by repeating the same racking/unracking procedures.

During the period from November 1997 to November 2001, virtually the only job which Cotto performed at Berkshire was the racking and unracking of the Eaton lightshields.  On those occasions (approximately 3 times) when the amount of Eaton lightshield work at Berkshire decreased (or ceased altogether when Eaton would use other plating companies), Berkshire laid Cotto off for periods of from 1 day to 9 months.

When the Eaton work returned to Berkshire and/or the amount of Eaton work increased, Berkshire rehired Cotto.

In or about November 2001 Berkshire permanently lost the Eaton lightshield job. Notwithstanding the loss of the Eaton lightshield work, and in order to help Cotto so that he would not have to find another job, Berkshire assigned Cotto to rack and unrack the following parts (primarily) for the following (6) other customers of Berkshire:  Dossert Corporation (copper/brass electrical connectors which were plated with tin), Carteret Die Casting Company (zinc die cast parts used in car antennae which were plated with copper, nickel and chrome), Rothchild Company (lead figurines which were plated with nickel and gold), Design Tech Inc. (small brass caps used in automobile reflectors which were plated with silver), Evercel Corporation (stainless steel electrodes used in commercial batteries which were plated with cobalt) and A & D Sheet Metal (aluminum housings used in power supplies which were chemically coated with chromate).

As with Eaton, the racking and unracking instructions with respect to each of these 6 jobs were relatively simple and repetitive.  And although it was significantly more difficult and time-consuming to give Cotto the initial instructions (with the help of other bilingual Berkshire employees) relating to the racking/unracking procedures for the 6 jobs because the number of procedures (and related instructions) had increased, ultimately Cotto was able to learn the instructions and perform the procedures.[5]

In contrast to the Eaton job, however, none of these 6 jobs was steady or continuous and, sometimes for significant periods, generated no work at all, and during the

---

[5] During the period from November 2001 through November 2003, Cotto also performed some (less than 5% of his time) elementary plating work for Dossert (and possibly Rothchild).  However, the plating instructions were also relatively simple (less than 7 steps) and, once learned by Cotto, could be repeatedly performed with little additional instruction.

period from November 2001 to November 2003 the amount of the work with respect to these 6 jobs decreased or ceased altogether.  As it had done with the Eaton job (supra), Berkshire laid Cotto off (approximately 5 times) and then rehired him depending upon the amount of work which Berkshire had in connection with the 6 jobs.  As of November 2003, Rothchild, Evercel and Design Tech had gone out of business and the racking and unracking of the Dossert, Carteret and A& D parts only required a total of approximately 5-20 hours of work per week.

In addition, as a result of the expanding global economy over the last few years and the increasing use of substitutes (such as plastic) for metal parts, the amount of metal plating work at Berkshire has generally declined from approximately $1,700,000 of revenues in 1999 to only approximately $1,000,000 of revenues in 2003.  Moreover, the simple, repetitive, long-term jobs which in the past had comprised more than 50% of Berkshire's business were being outsourced to countries (such as China, Korea and India) where the labor is substantially cheaper and governmental oversight with respect to the use of chemicals and disposal of toxic waste is much less demanding.

In an attempt to remain competitive in this evolving economy, during the period from in or about July 2002 to October 2003 Berkshire made a substantial capital outlay to adapt its operations to accommodate the less repetitive, more complex and shorter term work with greater efficiency (less employees) by installing all new equipment and relocating the equipment within Berkshire's shop area, as a result of which Berkshire's sales per employee hour since October 2003 have increased by between 20 to 40% (depending upon the time period).

However, notwithstanding the changes which were made by Berkshire, in or

about October and November 2003 Berkshire's monthly revenues still decreased by approximately 50% (from approximately $112,000 to approximately $66,000) and Berkshire sustained substantial losses during the last quarter of 2003.

As a result, and because he was the least senior racker/unracker at Berkshire, on November 11, 2003 Berkshire was (again) forced to lay Cotto off for lack of work.[6] Conversely, Berkshire did not lay Cotto off on November 11, 2003 because he was not able to understand oral instructions in English regarding the racking, plating and/or unracking procedures at Berkshire.

**BERKSHIRE'S INABILITY TO
REHIRE COTTO AFTER NOVEMBER 2003**:

Since November 2003 the (decreased amount of) racking/unracking for the Dossert, Carteret and A & D Sheet Metal jobs has been performed by individuals who had been employed at Berkshire before Cotto was laid off.  In addition, the amount of other racking and unracking work at Berkshire has not significantly increased.  Consequently, Berkshire has not been able to rehire Cotto.[7]

Moreover, since November 2003 the simple, repetitive and long term plating jobs have comprised only approximately 10% of Berkshire's business.  The plating jobs which Berkshire is now able to attract primarily consist of non-repetitive work which are of much shorter duration (usually lasting less than 1 day (sometimes for only 1/2 hour)

---

[6] Berkshire, however, continued to pay for Cotto's health insurance for at least 3 months after he was laid off.  In addition, while he was employed, Berkshire gave Cotto (and other employees at Berkshire) vacation pay, weekly and annual bonuses for good attendance and holiday bonuses.

[7] Nor has Berkshire hired anyone to replace Cotto.  Although Berkshire has advertised for and hired new employees since November 2003, they were employed primarily for jobs other than racking, plating and unracking parts.

and involving only 1 to 100 parts which are more expensive), have racking and plating sequences which are substantially more complex (sometimes involving the use of over 100 different tanks) and have significantly higher quality standards.  Thus, while a typical plating job at Berkshire prior to November 2003 consisted of hundreds of parts, lasted for approximately 1-2 weeks and involved the use of approximately 6-10 tanks, after November 2003 a typical plating job at Berkshire has consisted of an average of 5 to 50 parts, has lasted from between a few hours to only 1-2 days and involves the use of approximately 30 to 50 tanks.

As noted above, when the jobs at Berkshire were relatively simple, repetitive and lasted for long periods of time, the instructions with respect to the racking and unracking (and minimal plating) for a particular job could be given to Cotto (with the assistance of other employees who were bilingual) and, once the instructions were learned by him, Cotto could perform the racking and unracking (and minimal plating) without further (or very little) additional instruction or supervision for long periods of time.

However, since the jobs at Berkshire have become more complex, less repetitive and last for shorter time periods with significantly smaller numbers of parts, it is now necessary to continuously instruct and supervise employees to insure that the racking, plating and unracking procedures are performed correctly.  And because of the necessity for such continuous instruction and supervision, it is no longer possible to utilize other bilingual employees at Berkshire to translate the English instructions into Spanish for Cotto because that would require the bilingual (translating) employee to spend too much time assisting in the translation and not enough time doing his/her own work.

Simply stated, in order for Berkshire to conduct the plating business it has had

since in or about November 2003 in a safe and efficient manner, Berkshire no longer

has the luxury of employing individuals who are not able to understand oral instructions

in English.  Indeed, if Berkshire is not permitted to require that the employees who rack,

plate and unrack parts at Berkshire be capable of understanding oral instructions in

English, there is substantial doubt whether Berkshire will be able to continue as a (mar-

ginally) profitable business.[8]

      Therefore, Berkshire has not been able to rehire Cotto since November 2003 be-

cause there has not been a sufficient amount of racking/unracking work at Berkshire

and, even if there were, the work is more complex, less repetitive and of a shorter dura-

tion and, consequently, Cotto is not able to perform the work because of inability to un-

derstand oral instructions in English.

## ARGUMENT

### (1) COTTO'S TITLE VII CLAIM:

      42 U.S.C. §2000e-2(a)(1) provides that:

> It shall be an unlawful employment practice for an employer
> to fail or refuse to hire or to discharge any individual, or oth-
> erwise to discriminate against any individual with respect to
> his compensation, terms, conditions, or privileges of em-
> ployment, because of such individual's ... national origin ... .

      Cotto has represented that the only basis for his claim of discrimination in this ac-

tion is that Berkshire laid Cotto off in November 2003, and failed to rehire him after No-

vember 2003, because of Cotto's "lack of English fluency".

      Cotto has further represented that Berkshire's laying Cotto off and failing to rehire

---

[8] Berkshire's cumulative net loss for the past 4 years is ($13,000).

him because of his lack of English fluency constitutes <u>direct</u> <u>evidence</u> of Berkshire's <u>dis-</u><u>parate</u> <u>treatment</u> of Cotto on the basis of his Hispanic national origin.  Conversely, Cotto has conceded that he is <u>not</u> claiming that Berkshire is liable based upon any <u>circum-</u><u>stantial</u> <u>evidence</u> or based upon the theory that Berkshire's conduct had a <u>disparate</u> <u>im-</u><u>pact</u> on Cotto.

As a result, an analysis of Cotto's Title VII claim under the <u>McDonnell Douglas</u> <u>Corp.</u> v. <u>Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), framework is <u>not</u> required (<u>Trans World Airlines, Inc.</u> v. <u>Thurston</u>, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1984); <u>Fields</u> v. <u>Clark University</u>, 817 F.2d 931 (1st Cir. 1987)), and the ultimate issue in this action is whether Cotto was intentionally treated less favorably by Berkshire than individuals of other national origins because he is Hispanic.  <u>St. Mary's</u> <u>Honor Center</u> v. <u>Hicks</u>, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); <u>Interna-</u><u>tional Brotherhood of Teamsters</u> v. <u>United States</u>, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); <u>Texas Department of Community Affairs</u> v. <u>Burdine</u>, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); <u>Zapata-Matos</u> v. <u>Reckitt & Colman,</u> <u>Inc.</u>, 277 F.3d 40 (1st Cir. 2002); <u>LeBlanc</u> v. <u>Great American Insurance Co.</u>, 6 F.3d 836 (1st Cir. 1993), <u>cert.</u> <u>denied</u>, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); <u>Mesnick</u> v. <u>General Electric Co.</u>, 950 F.2d 816 (1st Cir. 1991), <u>cert.</u> <u>denied</u>, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

## (A)  <u>COTTO'S "DIRECT EVIDENCE" OF DISPARATE TREATMENT</u>:

As indicated above, Berkshire laid Cotto off in November 2003, and did not rehire Cotto after November 2003, because there was not enough work at Berkshire for Cotto

to do, <u>not</u> because Cotto was not able to understand oral instructions in English.

However, even assuming that Berkshire either laid Cotto off or did not rehire him because he was not able to understand oral instructions in English, that would <u>not</u> constitute direct evidence that Berkshire was discriminating against Cotto based upon his Hispanic national origin.

> Direct evidence ... "consists of statements by a decision-maker [of the employer] that directly reflect the alleged animus [of discrimination] and bear squarely on the contested employment decision," ... . * * * "A statement that can plausibly be interpreted two different ways -- one discriminatory and the other benign -- does not directly reflect illegal animus, and, thus, does not constitute direct evidence." * * * Our standard for direct evidence requires statements that are not "inherently ambiguous" ... . * * * We require statements that give us a "high degree of assurance" that a termination was attributable to discrimination. [citations omitted].

<u>Patten</u> v. <u>Wal-Mart Stores East, Inc.</u>, 300 F.3d 21, 25 (1st Cir. 2002), <u>cert.</u> <u>denied</u>, 539 U.S. 937, 123 S.Ct. 2572, 156 L.Ed.2d 621 (2003) (citing <u>Fernandes</u> v. <u>Costa Brothers Masonry, Inc.</u>, 199 F.3d 572 (1st Cir. 1999); and <u>Febres</u> v. <u>Challenger Caribbean Corp.</u>, 214 F.3d 57 (1st Cir. 2000)).  As stated in <u>Dalmau</u> v. <u>Vicao Aerea Rio-Grandense, S.A.</u>, 337 F.Supp.2d 1299, 1305 (S.D.Fla. 2004) (wherein the court held that an employer's requirement that a sales representative be fluent in Portuguese was not direct evidence of discrimination):

> [A] language requirement can only be circumstantial evidence of discrimination, since at least two inferences or presumptions must first be drawn.  First, it requires an inference that the requirement was actually intended to limit the eligible applicant pool to only native-born speakers of a particular country, rather than to include all those who speak the language in other countries or who learned the language regardless of their place of birth.  Second, it requires the fact finder to conclude that the language requirement has no le-

> gitimate purpose other than to weed out candidates based
> on national origin.  This is clearly not the type of evidence
> that can, by itself, prove an intent to discriminate.

If Berkshire laid Cotto off and/or failed to rehire him because Cotto could not understand oral English instructions, it may theoretically be possible to draw the inference that Berkshire was discriminating only against individuals with Hispanic national origins. Alternatively and more importantly, however, it could also support the inference that (as was the case) Berkshire was merely limiting its employee "pool" to those individuals who could understand oral instructions in English (and thereby perform the work at Berkshire) regardless of their national origin or place of birth and was not attempting to (only) exclude employees with Hispanic national origins.  Thus, Berkshire's limitation would exclude individuals of all (not just Hispanic) national origins who could not understand oral English instructions (including, for example, Americans who may have been raised in France and therefore would (possibly) only understand French).  Indeed, as noted above, Berkshire has, in fact, hired numerous individuals of Hispanic national origin who were capable of understanding oral instructions in English.

Therefore, even if Berkshire laid Cotto off and failed to rehire him based upon his inability to understand oral instructions in English, such conduct is plainly susceptible of a "benign" (non-discriminatory) interpretation which does not "directly reflect illegal animus" or discrimination against Cotto based upon his Hispanic national origin.[9]

Accordingly, Cotto has offered no direct evidence that Berkshire illegally dis-

---

[9] In addition to the significant percentage of Hispanic employees who have been employed by Berkshire (supra) (see Rivera-Aponte v. Restaurant Metropol #3, Inc., 338 F.3d 9 (1st Cir. 2003); De La Cruz v. New York City Human Resources Administration, DSS, 82 F.3d 16 (2d Cir. 1996)), further evidence that Berkshire did not discriminate against Cotto based upon his Hispanic national origin is the fact that Berkshire initially hired Cotto knowing that he was Hispanic and rehired him at least 8 times after he had been laid off for lack of work.  See Schnabel v. Abramson, 232 F.3d 83 (2d Cir. 2000).

criminated against Cotto.  And since Cotto has conceded that he is not relying on any

circumstantial evidence of discrimination (supra), Cotto's Title VII claim must be dis-

missed as a matter of law.  See Scott v. Sulzer Carbomedics, Inc., 141 F.Supp.2d 154

(D.Mass. 2001).

## (B)  BERKSHIRE'S "BONA FIDE OCCUPATIONAL QUALIFICATION":

Assuming, arguendo, that Berkshire's laying Cotto off and/or failing to rehire him

on the grounds that he could not understand oral instructions in English constituted di-

rect evidence that Berkshire had discriminated against Cotto on the basis of his His-

panic national origin, the requirement that Cotto be capable of understanding oral in-

structions in English clearly constituted a "bona fide occupational qualification"

("BFOQ").

42 U.S.C. §2000e-2(e) provides that:

> Notwithstanding any other provision of this subchapter, (1) it
> shall not be an unlawful employment practice for any em-
> ployer to hire and employ employees ... on the basis of his ...
> national origin in those certain instances where ... national
> origin is a bona fide occupational qualification reasonably
> necessary to the normal operation of that particular business
> or enterprise ... .

As noted in Price Waterhouse v. Hopkins, 490 U.S. 228, 242, 109 S.Ct. 1775, 1786,

104 L. Ed.2d 268, 282 (1989), the BFOQ defense was included in Title VII to insure

that employers would not be required to hire individuals who were not qualified to per-

form a particular job:

> To say that an employer may not take ... [an illegal
> discriminatory factor] into account is not, however, the end of
> the matter, for that describes only one aspect of Title VII.
> The other important aspect of the statute is its preservation

of an employer's remaining freedom of choice.  * * *  The statute's maintenance of employer prerogatives is evident from the statute itself and from its history, both in Congress and in this Court.

To begin with, the existence of the BFOQ exception shows Congress' unwillingness to require employers to change the very nature of their operations in response to the statute.  And our emphasis on "business necessity" in dispa-rate-impact cases, see Watson and Griggs, and on "legiti-mate, nondiscriminatory reason[s]" in disparate-treatment cases, see McDonnell Douglas Corp. v. Green ...; Texas Dept. of Community Affairs v. Burdine ..., results from our awareness of Title VII's balance between employee rights and employer prerogatives.  In McDonnell Douglas, we de-scribed as follows Title VII's goal to eradicate discrimination while preserving workplace efficiency:  "The broad, overrid-ing interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions.  In the implementation of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination, subtle or oth-erwise." * * *  An interpretive memorandum entered into the Congressional Record by Senators Case and Clark, coman-agers of the bill in the Senate, is representative of this gen-eral theme.  According to their memorandum, Title VII " 'ex-pressly protects the employer's right to insist that any pro-spective applicant, Negro or white, must meet the applicable job qualifications.  Indeed, the very purpose of Title VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color.' "  * * *  The memorandum went on:  "To discriminate is to make a distinction, to make a dif-ference in treatment or favor, and those distinctions or differ-ences in treatment or favor which are prohibited by section 704 are those which are based on any five of the forbidden criteria:  race, color, religion, sex, and national origin.  Any other criterion or qualification for employment is not affected by this title."  * * * The central point is this:  while an em-ployer may not take ... [a "forbidden criterion"] into account in making an employment decision (except in those very nar-row circumstances in which ... [the "forbidden criterion"] is a BFOQ), it is free to decide against ... [a person in a protected class] for other reasons. [citations omitted] [footnotes omit-ted].

Accordingly, the "formulations" for evaluating whether a business practice consti-