UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-30216-KPN

_____
                                              :

CARLOS CLAUDIO COTTO,                       :

                                    :

                          Plaintiff,          :

                                    :

                  v.                      :

                                    :

BERKSHIRE MANUFACTURING CORPORATION,   :

                                    :

                       Defendant.    :
_____ :

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
WITH RESPECT TO WHICH THERE IS NO
<u>GENUINE ISSUE TO BE TRIED</u>**

Pursuant to Rule 56.1 of the Local Rules for the United States District Court For
The District of Massachusetts, defendant Berkshire Manufacturing Corporation ("Berk-
shire") contends that there is no genuine issue to be tried with respect to the following
material facts:

1.  Berkshire was formed by Donald J. Schulz ("Schulz") in or about 1983 and,
since that time, Schulz has been the president and chief operating officer of Berkshire.
Affidavit of Donald J. Schulz ("Schulz Affidavit"), ¶ 2.

2.  Since July 1997, Berkshire has been engaged only in the business of provid-
ing electro-chemical plating and finishing services on various fabricated metal parts
which are received from its customers.  Schulz Affidavit, ¶ 2.

3.   Berkshire is a small "job shop" and, therefore, the amount of work at Berkshire at any given time depends upon the number of customers, and the number of parts of each customer, for which Berkshire is performing plating services.  Schulz Affidavit, ¶ 3.

4.   During the period from July 1997 to the present, Berkshire has been managed and supervised primarily by Schulz and Roberta Desjardins ("Desjardins") who have over 40 and 25 years (respectively) of industrial shop experience.  Schulz Affidavit, ¶ 4.

5.   Since 1997 Berkshire has, depending upon the amount of available work, had between 11 and 21 employees, and the current number of Berkshire employees is less than it was in November 2003.  Schulz Affidavit, ¶ 5.

6.   Between 40 and 80% of the individuals employed by Berkshire at any given time during the period from 1997 to date were of Hispanic origin.  Schulz Affidavit, ¶ 5.

7.   The procedures performed by Berkshire with respect to the plating of metal parts are complex, have demanding quality standards (and thus are reject prone) and vary significantly depending upon the nature of the hundreds of different parts which are being plated.  Schulz Affidavit, ¶¶ 6-13.

8.   In connection with the plating of parts, employees at Berkshire must initially be given detailed instructions with respect to attaching (or "racking") the parts onto a variety of different racks, immersing the racks into a specified sequence of from 5 to 125 different (sometimes electrified) cleaning and plating tanks which contain sometimes hazardous and/or poisonous chemicals and acids, removing the plated parts from the rack, inspecting and counting the plated parts, allocating the plated parts to a customer's order and then shipping the plated parts to the customer.  Schulz Affidavit, ¶¶ 6-

2

13.

9.  The complexity of the instructions with respect to the racking, plating and un-
racking of parts depends upon the nature of the parts which are being plated.  Schulz
Affidavit, ¶¶ 6-13.

10.  Because of, and depending upon, the complexity and variability of the rack-
ing, plating and unracking procedures, there are a multitude of issues which arise
throughout the day with respect to the procedures which are not included in the initial
instructions and, therefore, the employees at Berkshire who are performing the racking,
plating and unracking procedures must be constantly monitored and continuously given
additional, supplemental instructions and assistance.  Schulz Affidavit, ¶ 13.

11.  If the instructions with respect to the racking, plating and unracking proce-
dures for the plating of a part are not precisely followed, the plated part will not meet the
quality standards of, and therefore can not be shipped to, the customer.  Schulz Affida-
vit, ¶ 14.

12.  In some cases a defectively plated part must be discarded and Berkshire
must pay the customer for the discarded part; alternatively, if it is possible to salvage
the part, Berkshire must then incur the substantial costs of stripping, and again racking,
plating and unracking, the part, before it can be returned to the customer.  Schulz Affi-
davit, ¶ 14.

13.  If the instructions regarding the proper sequence and procedure for the plat-
ing of a part are not correctly followed, it is possible that the employee who is perform-
ing the plating can be burned either by the heat of or the acids contained in the plating
tanks.  Schulz Affidavit, ¶ 14.

14.  It is critical to the safe and efficient operation of Berkshire's business that Berkshire's employees strictly adhere to the instructions relating to the specific procedures for racking, plating and unracking of metal parts.  Schulz Affidavit, ¶ 14.

15.  Schulz and Desjardins, together with 2 or 3 (depending upon the time period) forepersons, are responsible for instructing employees with respect to how to perform the work at Berkshire.  Schulz Affidavit, ¶ 4.

16.  Neither Schulz, Desjardins or the forepersons at Berkshire speak or understand Spanish.  Schulz Affidavit, ¶ 4.

17.  Although he had no prior experience, Cotto was hired by Berkshire on a full time basis on July 17, 1997 at the suggestion of another Berkshire employee.  Schulz Affidavit, ¶ 15.

18.  Cotto was hired by Berkshire exclusively for the purpose of racking and unracking one (1) specific stainless steel part for an automobile headlight ("lightshield") for the Eaton Corporation which were chrome-plated by Berkshire.  Schulz Affidavit, ¶ 15.

19.  When Cotto was hired by Berkshire, the Eaton job constituted approximately 30-40% of Berkshire's business.  Schulz Affidavit, ¶ 15.

20.  When he was hired by Berkshire, Cotto was not able (and presently can not) understand oral (or written) instructions in English with respect to the procedures for racking, plating and/or unracking parts.  Schulz Affidavit, ¶ 16.

21.  When Cotto was hired by Berkshire, Schulz, Desjardins and the forepersons were, with the assistance of other bilingual employees at Berkshire, able to instruct Cotto on the procedures for racking and unracking the Eaton lightshields because the procedures were relatively simple, and once Cotto learned the instructions he did not

have to be given any further instructions because the racking/unracking procedures for
the Eaton lightshields did not change and Cotto could merely follow the same instruc-
tions he had learned by repeating the same racking/unracking procedures.  Schulz Affi-
davit, ¶ 16.

22.  During the period from November 1997 to November 2001, virtually the only
job which Cotto performed at Berkshire was the racking and unracking of the Eaton
lightshields.  Schulz Affidavit, ¶ 17.

23.  On those occasions (approximately 3 times) when the amount of Eaton light-
shield work at Berkshire decreased (or ceased altogether when Eaton would use other
plating companies), Berkshire laid Cotto off for periods of from 1 day to 9 months, and
when the Eaton work returned to Berkshire and/or the amount of Eaton work increased,
Berkshire rehired Cotto.  Schulz Affidavit, ¶ 17.

24.  In or about November 2001, Berkshire permanently lost the Eaton lightshield
job.  Schulz Affidavit, ¶ 18.

25.  Notwithstanding the loss of the Eaton lightshield work, and in order to help
Cotto so that he would not have to find another job, Berkshire assigned Cotto to rack
and unrack the following parts (primarily) for the following (6) other customers of Berk-
shire:  Dossert Corporation (copper/brass electrical connectors which were plated with
tin), Carteret Die Casting Company (zinc die cast parts used in car antennae which
were plated with copper, nickel and chrome), Rothchild Company (lead figurines which
were plated with nickel and gold), Design Tech Inc. (small brass caps used in automo-
bile reflectors which were plated with silver), Evercel Corporation (stainless steel elec-
trodes used in commercial batteries which were plated with cobalt) and A & D Sheet

Metal (aluminum housings used in power supplies which were chemically coated with chromate).  Schulz Affidavit, ¶ 18.

26.  As with Eaton, the racking and unracking instructions with respect to each of the 6 jobs were relatively simple and repetitive.  Schulz Affidavit, ¶ 19.

27.  Although it was significantly more difficult and time-consuming to give Cotto the initial instructions (with the help of other bilingual Berkshire employees) relating to the racking/unracking procedures for the 6 jobs because the number of procedures (and related instructions) had increased, ultimately Cotto was able to learn the instructions and perform the procedures.  Schulz Affidavit, ¶ 19.

28.  During the period from November 2001 through November 2003, Cotto also performed some (less than 5% of his time) elementary plating work for Dossert (and possibly Rothchild), with respect to which the plating instructions were also relatively simple (less than 7 steps), and once the procedures were learned by Cotto he could re-peatedly perform them with little additional instruction.  Schulz Affidavit, ¶ 19.

29.  In contrast to the Eaton job, however, none of the 6 jobs was steady or con-tinuous (and, sometimes for significant periods, generated no work at all), and during the period from November 2001 to November 2003 the amount of the work with respect to the 6 jobs decreased or ceased altogether.  Schulz Affidavit, ¶ 20.

30.  As it had done with the Eaton job, Berkshire laid Cotto off (approximately 5 times) and then rehired him depending upon the amount of work which Berkshire had in connection with the 6 jobs.  Schulz Affidavit, ¶ 20.

31.  As of November 2003, Rothchild, Evercel and Design Tech had gone out of business and the racking and unracking of the Dossert, Carteret and A& D parts only

required a total of approximately 5-20 hours of work per week.  Schulz Affidavit, ¶ 20.

32.   As a result of the expanding global economy over the last few years and the increasing use of substitutes (such as plastic) for metal parts, the amount of metal plating work at Berkshire has generally declined from approximately $1,700,000 of revenues in 1999 to only approximately $1,000,000 of revenues in 2003.  Schulz Affidavit, ¶ 21.

33.   As a result of the expanding global economy over the last few years, the simple, repetitive, long-term jobs which in the past had comprised more than 50% of Berkshire's business were being outsourced to countries (such as China, Korea and India) where the labor is substantially cheaper and governmental oversight with respect to the use of chemicals and disposal of toxic waste is much less demanding.  Schulz Affidavit, ¶ 21.

34.   In an attempt to remain competitive in this evolving economy, during the period from in or about July 2002 to October 2003 Berkshire made a substantial capital outlay to adapt its operations to accommodate the less repetitive, more complex and shorter term work with greater efficiency (less employees) by installing all new equipment and relocating the equipment within Berkshire's shop area, as a result of which Berkshire's sales per employee hour since October 2003 have increased by between 20 to 40% (depending upon the time period).  Schulz Affidavit, ¶ 22.

35.   Notwithstanding the changes which were made by Berkshire, in or about October and November 2003 Berkshire's monthly revenues decreased by approximately 50% (from approximately $112,000 to approximately $66,000), and Berkshire sustained substantial losses during the last quarter of 2003.  Schulz Affidavit, ¶ 23.

36.  As a result of the substantial decrease in Berkshire's business and because he was the least senior racker/unracker at Berkshire, on November 11, 2003 Berkshire was (again) forced to lay Cotto off for lack of work.  Schulz Affidavit, ¶ 23.

37.  Berkshire did not lay Cotto off on November 11, 2003 because he was not able to understand oral instructions in English regarding the racking, plating and/or un-racking procedures at Berkshire.  Schulz Affidavit, ¶ 23.

38.  After he was laid off in November 2003, Berkshire continued to pay for Cotto's health insurance for at least 3 months.  Schulz Affidavit, ¶ 23.

39.  While he was employed, Berkshire gave Cotto (and other employees at Berkshire) vacation pay, weekly and annual bonuses for good attendance and holiday bonuses.  Schulz Affidavit, ¶ 23.

40.  Berkshire has not been able to rehire Cotto since November 2003 because the (decreased amount of) racking/unracking for the Dossert, Carteret and A & D Sheet Metal jobs is able to be performed by individuals who had been employed at Berkshire before Cotto was laid off, and the amount of other racking and unracking work at Berk-shire has not significantly increased.  Schulz Affidavit, ¶ 24.

41.  Berkshire has not hired anyone to replace Cotto.  Schulz Affidavit, ¶ 25.

42.  Although Berkshire has advertised for and hired new employees since No-vember 2003, they were employed primarily for jobs other than racking, plating and un-racking parts.  Schulz Affidavit, ¶ 25.

43.  Since November 2003, the simple, repetitive and long term metal plating jobs have comprised only approximately 10% of Berkshire's business.  Schulz Affidavit, ¶ 26.

44. Since November 2003, the plating jobs which Berkshire has been able to attract involve non-repetitive work which are of much shorter duration (usually lasting less than 1 day (sometimes for only 1/2 hour) and involving only 1 to 100 parts which are more expensive), have racking and plating sequences which are substantially more complex (sometimes involving the use of over 100 different tanks) and have significantly higher quality standards.  Schulz Affidavit, ¶ 26.

45. A typical plating job at Berkshire prior to November 2003 consisted of hundreds of parts, lasted for approximately 1-2 weeks and involved the use of approximately 6-10 tanks.  Schulz Affidavit, ¶ 26.

46. A typical plating job at Berkshire after November 2003 has consisted of an average of 5 to 50 parts, has lasted from between a few hours to only 1-2 days and involves the use of approximately 30 to 50 tanks.  Schulz Affidavit, ¶ 26.

47. When the jobs at Berkshire were relatively simple, repetitive and lasted for long periods of time, the instructions with respect to the racking and unracking (and minimal plating) for a particular job could be given to Cotto (with the assistance of other employees who were bilingual) and, once the instructions were learned by him, Cotto could perform the racking and unracking (and minimal plating) without further (or very little) additional instruction or supervision for long periods of time.  Schulz Affidavit, ¶ 27.

48. Since the jobs at Berkshire have become more complex, less repetitive and last for shorter time periods with significantly smaller numbers of parts, it is now necessary to continuously instruct and supervise employees to insure that the racking, plating and unracking procedures are performed correctly.  Schulz Affidavit, ¶ 28.

49. Because of the necessity for continuous instruction and supervision with re-

spect to the more complex, less repetitive and shorter term jobs, it is no longer possible to utilize other bilingual employees at Berkshire to translate English instructions into Spanish for Cotto because that would require the bilingual (translating) employee to spend too much time assisting in the translation and not enough time doing his/her own work.  Schulz Affidavit, ¶ 28.

50.  In order for Berkshire to conduct the plating business it has had since in or about November 2003 in a safe and efficient manner, Berkshire is no longer able to employ individuals who are not able to understand oral instructions in English.  Schulz Affidavit, ¶ 29.

51.  Berkshire's cumulative net loss for the past 4 years is ($13,000).  Schulz Affidavit, ¶ 29.

52.  If Berkshire is not permitted to require that the employees who rack, plate and unrack parts at Berkshire be capable of understanding oral instructions in English, there is substantial doubt whether Berkshire will be able to continue as a (marginally) profitable business.  Schulz Affidavit, ¶ 29.

53.  Even if Berkshire had a sufficient amount of racking/unracking work for Cotto to do since November 2003, Berkshire has not been able to rehire Cotto because the work is more complex, less repetitive and of a shorter duration and Cotto is not able to perform the work because of his inability to understand oral instructions in English.  Schulz Affidavit, ¶ 30.

54.  The requirement that individuals employed by Berkshire for the racking, plating and unracking jobs at Berkshire be capable of understanding oral instructions in English constitutes a "bona fide occupational qualification".  Schulz Affidavit, ¶¶ 6-14.

55. Berkshire had a legitimate reason, standing alone and separate and apart from any (alleged) improper discrimination for laying Cotto off and not rehiring him. Schulz Affidavit, ¶¶ 23 and 30.

56. The inability of Cotto to understand oral instructions in English was not the causative or determinative factor, did not contribute significantly to and/or was not a material and important consideration for or with respect to Berkshire laying Cotto off and not rehiring him.  Schulz Affidavit, ¶¶ 23 and 30.

57. Berkshire did not intentionally (or otherwise) discriminate against Cotto based upon his Hispanic national origin.  Schulz Affidavit, ¶¶ 23, 30 and 31.


Dated:  Springfield, Massachusetts
          January 6, 2006

                                        LAW OFFICES OF ROBERT ARONSON


                                                /s/ Robert Aronson
                                        By _____
                                                Robert Aronson, Esq.

                                        Attorney for Defendant Berkshire
                                          Manufacturing Corporation
                                        101 State Street
                                        Springfield, Massachusetts   01103
                                        Telephone:  (413) 733-2600
                                        Facsimile:  (413) 737-4318
                                        BBO No.  541800


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by electronic filing on January  6, 2006.

                                        /s/ Robert Aronson
                                        _____
                                                Robert Aronson