# EXHIBIT A



# STONEHILL COLLEGE

### 320 WASHINGTON STREET
### NORTH EASTON, MASSACHUSETTS 02357-4018

Robert A. Rosenthal, Ph.D.                                    (508) 565-1200
Director, Center for Regional and Policy Analysis            FAX: (508) 565-1417
Martin Institute                                    e-mail: rrosenthal@stonehill.edu

November 5, 2005

Attorney Suzanne Garrow
Heisler, Feldman & McCormick, P.C.
1145 Main Street
Suite 215
Springfield, MA 01103

Re: Carlos Cotto

Dear Attorney Garrow,

I am responding to your request to determine the economic losses suffered by Carlos Cotto as a result of his termination from Berkshire Manufacturing Corporation on November 17, 2003. I have evaluated the probable net lost earnings and fringe benefits which resulted from this action. My analysis employs standard methodology used by economists to determine these losses.

### Background

Carlos Cotto  is a high school graduate  with some additional training. He worked for approximately seven years for the Berkshire Manufacturing Corporation.  While he is not married, he does not live alone and he has taken some responsibility for assisting in the upbringing of his nephews.

### Methodology

In cases involving discharge due to national origin discrimination, the most important factor in determining the extent of losses is determining the time horizon associated with those damages. "The general rule to follow in calculating the damages from wrongful discharge seems straightforward enough: what the plaintiff's earnings would have been had the contract been performed less what the plaintiff can now earn from alternative employment."[1]

---

[1] Bowles, Tyler J., "Wrongful Discharge: The Time Horizon of Future Damages and the Economic Basis for Damages", *Journal of Legal Economics*, Volume 4, Number 1, Spring 1994, p.76

The burden is "on the economist to correctly implement the rule. This requires consideration of possible contingencies which would end the employer's obligation to perform under an indefinite term contract." (Tyler, p.76)

These differences must then be expressed in terms of present value.

**Data and Assumptions**

The relevant data surrounding this his economic losses involves Mr. Cotto 's wages and benefits, his length of employment with the firm and his ability to find alternative employment in a timely manner and with comparable wages.

The first component of the analysis is to determine what Mr. Cotto might have earned had he remained in the employ of Berkshire Corporation. In other words, we must determine the likelihood that, "but for the termination, the terminated employee would have remained working for the defendant employer" and for what period of time.

Mr. Cotto's tax returns indicate that based on his last two years while employed at Berkshire, he averaged approximately $21,000 per year in earnings:

Earnings at Berkshire Manufacturing (Tax Returns)

2002 = $24,338
2003 = 17,763[2]

In addition to these wages, he had the opportunity to earn a $40/week bonus for perfect attendance. I have applied this bonus to half of the weeks over the course of a full year based on an overview of his attendance records. This was then included in his expected earnings and factored into his losses. Taking all of these factors into account, I project that his 2004 earnings, but for the termination from Berkshire, would have been $22,040.

Fringe Benefits

Only health insurance factors into his losses in this situation. As stated by Mr. Donald Schulz, president of Berkshire, the company provides payment of "1/2 of the cost of health insurance (estimated to be approximately $3,500-5,000/year)." Since it is my understanding that Mr. Cotto no longer has health insurance, we factor this into his losses.[3]

---

[2] His actual earnings this year was $15,662. This represented a partial year and accordingly, a projection is made based on what his earnings would have been had he worked the remainder of the year.

[3] If Mr. Cotton qualified for government assisted medical insurance, such as Medicaid, this might partially offset his losses.

## Duration of Employment

Mr. Cotto had approximately seven years experience at the time that the termination occurred. This tenure with the firm is significant in light of the experience of Berkshire Manufacturing in attempting to fill similar positions after his termination. Based on Exhibit B to "Answers and Objections of Defendant to Plaintiff's Interrogatories" the names of nine individuals were hired on a full time basis (with benefits) by Berkshire after November 17, 2003. Of those nine, only two are still employed by Berkshire, one of those being the production foreperson. Five of the nine quit having worked an average of only 5 weeks. Of those five, the longest anyone had stayed with the firm was 15 weeks, the shortest tenure was only 1 week. Two of the nine were laid off, once again, with very limited tenure averaging only 12.5 weeks. Presumably, and based on these turnover rates, the financial compensation relative to the work required was deemed less than adequate by over half of those hired in recent years.

Since Mr. Cotto had already been employed by Berkshire for seven years, it would appear quite likely that it was his intention, for any number of reasons, and unlike those who followed him, to stay on that job with Berkshire for the foreseeable future. It is worth noting that Mr. Cotto worked for Berkshire throughout one of the strongest economic periods that we have experienced in thirty years. His tenure with the company spanned the years 1996 through 2003. Unemployment rates in Springfield County had peaked at just over 12% in 1991 but had fallen to under 4% by the end of the decade. If he was content to remain in their employ during these peak economic years, it would seem reasonable that his intent was to stay indefinitely. This behavior could be due to his own assessment that his alternatives were less attractive than what Berkshire offered in the way of compensation, his comfort level of working with his co-workers, or any number of reasons. Most importantly, the actual reason for his continued employment with Berkshire is less important than the fact that he actually stayed. Berkshire appeared to provide employment security and health benefits to someone with limited English speaking ability, that could not be replicated elsewhere.

Nevertheless, it is virtually impossible to state with absolute certainty how long Mr. Cotto would have remained with Berkshire. Factors other than his intentions and desires may have reduced his expected length of employment with Berkshire. Accordingly we will rely on an incremental approach and use three estimates regarding how long he might have remained with Berkshire: 5 years, 10 years and 20 years. As his expected tenure with Berkshire increases, increasing levels of economic losses are projected.

## Residual Earnings

Once projected economic losses associated with the discharge from Berkshire are determined, it is necessary to deduct from these lost earnings what Mr. Cotto has been able to and might still be able to earn in another capacity. We have the benefit of being able to look at his

earnings history for a short period following his discharge. Focussing on his tax return for the year 2004, the first full year since his termination, as well as "Plaintiff's Response to the Defendant's Interrogatories" concerning his attempts to mitigate any damages sustained, it appears that his expected earnings has been reduced substantially. His tax returns show only approximately $9,000 in earnings for 2004 and he reports that he earns $9.01 per hour, working on a tobacco farm, for 40 hours per week, for approximately six months per year – May through October (see pp. 4-5 of the interrogatory). These facts, regarding his employment post-termination, also point to an annual expected earnings of approximately $9,000 per year, consistent with his tax return of 2004.

It is not surprising that his expected earnings, post-displacement, are lower than his pre-displacement earnings. In an article published in the *Industrial and Labor Relations Review*, authored by Bruce C. Fallick[4], he concludes that "displaced workers experience more nonemployment than do nondisplaced workers, but the difference fades after about four years. In contrast, earnings losses of displaced workers are large and persistent." Another study[5] reports that when modeling **changes** in individual earnings for those displaced, "Hispanics had lower earnings than non-Hispanics." The point is in general, that we should not be surprised to see Mr. Cotto's expected earnings, given his work experience and limited English speaking ability, to decline significantly after his termination from Berkshire.

Once again, the record also reflects that Mr. Cotto did engage in a sustained search for permanent employment as indicated by his contacting multiple employers without any success. (see page 4 of answers to interrogatories).

Nevertheless, it is possible that in addition to his current seasonal work, he may, in the future, secure temporary work intermittently during the winter months when he is not employed by the tobacco farm. Accordingly, our estimates of economic losses will reflect both the possibilities that he only continues to work during the season at the tobacco farm, and that he finds additional temporary employment at just above minimum wage ($6.50 per hour) for 20 weeks per year and 40 hours per week. We also assume that neither of these options provides any health coverage.

Wage Growth

Economic trends throughout the 1990's and to the current time, indicates that the Federal Reserve Board has been and is likely to continue to be quite vigilant in their attempt to control inflation.[6] This has had lead to a period of remarkably sustained economic growth with the exception of the recession and slow recovery following the events of September 11th. The current economic environment suggests a period of uncertainty as we continue to hear Mr. Greenspan speak about the ambiguity of the recovery and inflationary expectations. Accordingly, we assume, consistent with long-term trends, that earnings would grow in real terms at only 1 per cent, or stated in other words, at 1 per cent above the rate of inflation. We

---

[4] Bruce C. Fallick, "A Review of the Recent Empirical Literature on Displaced Workers", Industrial and Labor Relations Review, Vol 50, No.1 (Oct., 1996), 5-16.

[5] Paul M. Ong, Mar, Don, "Post-Layoff Earnings among Semiconductor Workers", Industrial and Labor Relations Review, Vol 45, No.2 (Jan., 1992), 366-379.

[6] It does not appear that this philosophy will change after Mr. Greenspan retires and is replaced by Mr. Bernanke.

apply this wage growth to both his full time earnings had he remained with Berkshire, as well as to his current job and any employment opportunities he might attain in the future.

Discount Rate

In order to determine the total value of his economic losses, the difference between what he might have earned at Berkshire, including health benefits, less what he might earn at his current and possible future positions, must be expressed in present value terms. In other words value of the dollar received today is different that a dollar that might be received in ten years. To do this, we must discount all pertinent dollar amounts by an appropriate interest rate.

The rate chosen is 2.5 percent, a rate approximately equal to the average annual "real" (inflation adjusted) yield on medium term government bonds for the past 30 years. We use the "real" rate just as we do with expected wage gains. This method, using real discount rates in tandem with real wage growth rates eliminates the need to forecast future inflation rates and is the standard methodology employed by economists to determine the present values of future economic losses.

**Economic Losses**

Using the methodologies and applying the assumptions described above, we present the economic losses of Mr. Cotto with the several scenarios previously mentioned.

Scenario (A): No Additional Work During the Off-season

| **Additional Years with Berkshire** | **Losses** |
| --- | --- |
| 5 Years | $ 84,492 |
| 10 Years | 163,149 |
| 20 Years | 290,913 |

Scenario (B): With Additional Work During the Off-season

| **Additional Years with Berkshire** | **Losses** |
| --- | --- |
| 5 Years | $ 71,267 |
| 10 Years | 135,145 |
| 20 Years | 258,448 |

**Compensation:** I will be compensated at the rate of $200/hour to do the analysis and to provide this report. My compensation for testifying and for responding at deposition is $250/hour with a minimum charge of a half day (4 hours).

**Testimony in Last Four Years:** There are two case in which I testified at trial within the last four years.

November, 2001, at Fall River Superior Court, Lazaro v. Ferreira. My testimony occurred on November 8, 2001. Will continue to attempt to do so.

Robert P. Sisoian v. Verizon New England, Inc.; Suffolk Superior Court, Docket No. SUCV2002-00271B.

Please understand that this is my estimate of economic losses suffered by Mr. Cotto with the information I have to date. If any additional information becomes available, changes or modifications to the results may be necessary. If you have any additional questions, please do not hesitate to contact me.

Sincerely,

Robert A. Rosenthal, Ph.D.
Professor of Economics