UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    :
CARLOS CLAUDIO COTTO,                :
                                                    :
                    Plaintiff,              :        DOCKET NO.  3:04-cv-30216-KPN
                                                    :
v.                                                :
                                                    :
BERKSHIRE MANUFACTURING      :
CORPORATION,                               :
                    Defendant.            :
_____:


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.      **INTRODUCTION**

Plaintiff Carlos Claudio Cotto[1] brings this action for equitable relief and

compensatory and punitive damages against defendant Berkshire Manufacturing

Corporation ("Berkshire") under Title VII of the Civil Rights Act and Chapter 151B of

the Massachusetts laws against discrimination[2] for acts of discrimination against him

on the basis of his national origin.  Mr. Claudio was employed by Berkshire between

July 1997, and November 2003, at Berkshire's metal plating plant.  From November

2003 onward, he was subjected to discriminatory actions and omissions by the

defendant which included the following:  a) he was discriminatorily terminated from

his position which he had been performing for six and a half years due to "lack of

English" and b) Mr. Claudio was persistently passed over for hire despite his efforts

to secure reemployment by Berkshire in favor of less experienced, less qualified

employees who are not a member of the protected class.

_____
[1] Carlos Claudio Cotto is referred to in this Memorandum as Mr. Claudio which is his correct surname,
not Cotto.
[2] For purposes of Mr. Claudio's claims, the state and federal anti-discrimination laws are coextensive
for purposes of liability and can be analyzed under Title VII case law.

The defendant has moved for summary judgment on all claims asserted by Mr. Claudio in his Complaint. For the reasons set forth below, the defendant is not entitled to an award of summary judgment.

## II.    <u>FACTUAL BACKGROUND</u>

The plaintiff has prepared a fully supported Concise Statement of Material Facts as to Which There Exists a Genuine Issue to Be Tried ("SOF") which he has submitted in support of his opposition to the Defendant's Motion for Summary Judgment, and the plaintiff incorporates those facts into this Memorandum of Law by reference.

## III.    <u>SUMMARY JUDGMENT STANDARD IN DISCRIMINATION CASES</u>

Under the Federal Rules of Civil Procedure, summary judgment is appropriate only when all the relevant pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Barbour v. Dynamics Research Corp</u>., 63 F.3d 32, 36 (1st Cir. 1995). All reasonable inferences which may be drawn from the record before the court are to be indulged in favor of the nonmoving party. <u>Oliver v. Digital Equipment Corp</u>., 846 F.2d 103, 105 (1st Cir. 1988).

The movant bears the initial burden of proving that no genuine issues of material fact exist for trial.  <u>Sands v. Ridefilm Corp.</u>, 212 F.3d 657, 661 (1st Cir. 2000).  See, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 -324 (1986). The First Circuit has defined a "genuine issue of material fact" as that which "might affect the outcome of the suit under the governing law." In deciding a motion for summary judgment, "the court must ask 'whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." <u>Lipsett v. University of Puerto Rico</u>, 864 F.2d

881, 894 (1st Cir. 1988), *quoting,* Anderson v. Liberty Lobby, Inc., 477 U.S. at 248,

252, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986)(internal quotations omitted).  In other

words, "[a]n issue is genuine if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." Oliver, 846 F.2d at 105 (citations omitted).

In general, summary judgment is an inappropriate tool for resolving claims of

employment discrimination.  Discrimination cases often involve issues of motivation

and intent which can only be proved through reliance on circumstantial evidence.

Such determinations regarding motivation and intent depend on complicated

inferences from the evidence and are therefore peculiarly within the province of the

jury. See eg., LeBlanc v. Great American Insurance Co., 6 F.3d 836, 840 (1st Cir.

1993), *cert. denied*, 128 L. Ed. 2d 72, 114 S. Ct. 1398 (1994); Waltman v.

International Paper CO., 875 F.2d 468 (5th Cir. 1989). Thus, courts should exercise

particular caution before granting summary judgment for employers on such issues of

pretext, motive and intent. Santiago-Ramos v. Centennial P,R, Wireless Corp., 217 F.

3d 46, 54 (1st Cir. 2000). The reason for this caution is "because of the availability of

seemingly neutral rationales under which an employer can hide its discriminatory

intent." Hodgens v. General Dynamics Corp., 144 F.2d 151, 167 (1st Cir. 1998).

## IV.    ARGUMENT

### A.    THE PLAINTIFF CAN PROVE HIS DISCRIMINATION CASE BY PRESENTING *EITHER* DIRECT OR CIRCUMSTANTIAL PROOF.

Plaintiff contends that he was both terminated and denied a position with

defendant because of his national origin.  Mr. Claudio makes this claim based on,

among other things, the averment by the defendant in its verified position statement

submitted by Donald Schulz, President and Chief Operating Officer of Berkshire to

the MCAD that Mr. Claudio's was treated differently due to "his lack of English".

(SOF para. 62.)  The plaintiff can prove his case through direct evidence because the

defendant has baldly claimed that it terminated Mr. Claudio and subsequently failed to hire him due to his "lack of English."

However, the defendant is simply incorrect in its assertion that because its impermissible statement may be viewed as direct evidence of national origin discrimination the plaintiff has somehow conceded that his discrimination case may not also be proven by circumstantial evidence.  Defendant misrepresents the holdings of the cases setting forth the analytical framework in discrimination cases. Defendant's tortured reading of Trans World Airlines Inc. v. Thurston, 469 U.S. 111 (1984) and Fields v. Clark Univ. , 817 F.2d 931 (1st Cir. 1987), is both disingenuous and wrongheaded.  The United States Supreme Court and the First Circuit recognize that where there is direct proof of discrimination, there is no need to go through the McDonnell Douglas Corp, v, Green, 411 U.S. 792 (1973) burden-shifting paradigm. However, neither Trans World nor Fields, nor any of the other cases cited by the defendant stand for the proposition that a Plaintiff cannot rely on direct evidence and alternatively predicate his case on circumstantial proof relying on McDonnell Douglas burden-shifting.  As in the majority of discrimination cases, an inference of intentional discrimination may also be drawn here -- from the defendant's illegal statement and from other circumstantial evidence.   The existence of what may be considered direct evidence does not somehow preclude the plaintiff from proving his case through inferential proof.

### B.    DEFENDANT MAINTAINED A FACIALLY DISCRIMINATORY PRACTICE BY TERMINATING AND FAILING TO HIRE MR. CLAUDIO DUE TO HIS "LACK OF ENGLISH".

Typically, direct evidence consists of statements of discriminatory intent attributable to an employer and a disparate treatment plaintiff must show by direct evidence that an illegitimate criterion was a substantial factor in the decision.

Price Waterhouse v. Hopkins, 490 U.S. 228, 276 (1989).

> Requiring that the plaintiff demonstrate that an illegitimate factor played a substantial role in the employment decision identifies those employment situations where the deterrent purpose of Title VII is most clearly implicated. As an evidentiary matter, where a plaintiff has made this type of strong showing of illicit motivation, the factfinder is entitled to presume that the employer's discriminatory animus made a difference to the outcome, absent proof to the contrary from the employer.

Id.

The law has long recognized that language and discrimination based on national origin are inextricably linked. Many Courts view language as a trait so related to one's national origin that unfavorable treatment based on language or language skills may be a viewed proxy for national origin discrimination. See, e.g., Hernandez v. New York, 500 U.S. 352, 371-71 (1991) ("It may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis."); Lau v. Nichols, 414 U.S. 563, 568-69 (1974) (failure to provide equal educational opportunities to Chinese-speaking students constituted national origin discrimination under Title VI of the Civil Rights Act of 1964); Hernandez v. Texas, 347 U.S. 475, 480 n.12 (1954) ("just as persons of a different race are distinguished by color, these Spanish names provide ready identification of the members of this class [of Mexican-Americans]"); Yniguez v. Arizonans for Official English, 69 F. 3d 920, 948 (9th Cir. 1995), vacated on other grounds, 520 U.S. 43 (1997) ("Since language is a close and meaningful proxy for national origin, restrictions on the use of languages may mask discrimination against specific national origin groups"); Odima v. Westin Tucson Hotel Co., 991 F. 2d 595, 601 (9th Cir. 1993) ("accent and national origin are obviously inextricably intertwined"); U.S. v. Alcantar, 897 F. 2d 436, 440 (9th Cir. 1990) (acknowledging "how closely tied Spanish language is to Hispanic identity");

Fragante v. City and County of Honolulu, 888 F. 2d 591 (9th Cir. 1989), cert. denied, 494 U.S. 1081 (1990) (accent discrimination may be actionable as national origin discrimination under Title VII); Gutierrez v. Municipal Court, 838 F. 2d 1031, 1039 (9th Cir. 1988), vacated as moot, 490 U.S. 1016 (1989) ("the cultural identity of certain minority groups is tied to the use of their primary tongue," and that "rules which have a negative effect on . . . non-English speakers" may constitute national origin discrimination).  Similarly, the EEOC's Guidelines on Discrimination Because of National Origin Discrimination establish that it will carefully investigate charges of "[f]luency-in-English requirements, such as denying employment opportunities because of an individual's foreign accent, or inability to communicate well in English." 29 C.F.R. § 1606.6(b)(1).

The defendant's admission that it fired Mr. Claudio and failed to hire him to open positions for which he was qualified due to his "lack of English", (SOF 62), is the type of direct evidence that demonstrates "that an illegitimate factor played a substantial role in the employment decision."  Price Waterhouse, 490 U.S. at 276. As explained more fully at pages 10-14 below, defendant's unwritten "policy" that employees of Berkshire have an undefined and arbitrary level of English proficiency and must "read and understand instructions" in English, (SOF 56, 58), is invalid, and impermissible in light of the nature of its business, which requires no customer service or interaction and instead mandates its employees to put parts on a rack and dip those parts in a tank of liquid metal. (SOF 10, 21, 22, 27, 28.) [3]

Berkshire also argues that its alleged policy cannot be direct evidence of discrimination against people of Hispanic national origin because it also discriminates

---

[3] The law has long recognized that a policy will be considered discrimination on the basis of a protected characteristic even if it only affects a somewhat mutable characteristic or a sub-class of the protected classification.  See e.g. International Union UAW v. Johnson Controls, 499 U.S. 187 (1991)(fertile women constitute a protected classification).

against people from France with limited English proficiency and that that somehow

insulates Berkshire from liability for discrimination here.[4]  One need not search far to

point out the absurdity of this argument.  Suffice it to say, if Berkshire had a policy

that it did not hire any minorities, it could not shield itself from liability under Title VII

because the illegal policy applies equally to all minority groups.

Accordingly, there is sufficient direct evidence of discrimination to submit this

case to a jury and summary judgment should be denied.

### C.   DEFENDANT HAS FAILED TO PRESENT ANY EVIDENCE TO SUPPORT A DEFENSE THAT PROFICIENCY IN ENGLISH WAS A BONA FIDE OCCUPATIONAL QUALIFICATION.

Defendant's policy excluding Mr. Claudio due to his "lack of English" is

discriminatory on its face.  In its Motion for Summary Judgment, the Defendant does

not offer a single piece of evidence to dispute the existence of its facially exclusionary

policy. Rather, it acknowledges that a so-called policy exists and attempts to justify it

alleging that the people who previously translated instructions for Mr. Claudio can no

longer do so.  Berkshire also argues that if cannot require rackers and platers to fully

understand English instructions it will somehow undermine its business. Because

Berkshire maintains a facially discriminatory policy, the relevant issue is whether the

Defendant treated Mr. Claudio differently based on his national origin for reasons that

meet the standards of a *Bona Fide* Occupational Qualification ("BFOQ").  However,

the Defendant cannot justify or excuse a blanket policy of discrimination by alleging

---

[4] The case law provides that employer rules requiring employees to speak English-only may violate Title VII.  See e.g.  Andujar v. Nortel Networks Inc., 400 F.Supp.2d 306,332 (Dein, U.S.M.J.);  Rivera v. Baccarat, Inc., No. 95 Civ. 9478 MBM JCF, 1997 WL 777887, at * 4 (S.D.N.Y. Dec.15, 1997); EEOC v. Synchro-Start Prods., Inc., 29 F.Supp.2d 911, 912 (N.D.Ill.1999); EEOC v. Premier Operator Servs., 113 F.Supp.2d 1066 (N.D.Tex.2000); Sandoval v. Hagan, 7 F. Supp. 2d 1234 1282-83 (M.D. Ala. 1998), aff'd, 197 F. 3d 484 (11th Cir. 1999).  It naturally follows that an employer cannot adopt a policy like an English only rule, or, as here, an English proficiency requirement that disadvantages a number of different national origin groups and somehow avoid liability as to any particular group as a result.

that this nebulous English proficiency requirement is a bona fide occupational qualification without the required factual showing.  That showing cannot be made here.

Section 703(e) of Title VII only permits overt discrimination "where … national origin … is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. §2000e-2(e)(1). Since the assertion of a BFOQ is in the nature of an affirmative defense, the employer bears the burden of establishing that an otherwise unlawful policy or practice falls within this "extremely narrow exception to the general prohibition of discrimination on the basis of sex." Dothard v. Rawlinson, 433 U.S. 321, 332 (1977).  "[I]n order to qualify as a BFOQ, a job qualification must relate to the 'essence' or to the 'central mission of the employer's business.' " International Union UAW v. Johnson Controls, 499 U.S. 187 (1991) [5]  "Title VII limits those situations in which discrimination is permissible to "certain instances" where ... discrimination is "reasonably necessary" to the "normal operation" of the "particular" business. . . .   But the most telling term is "occupational";  this indicates that these objective, verifiable requirements must concern job-related skills and aptitudes." Id. at 201.

Under the BFOQ analysis, discrimination is permissible only if those aspects of a job that allegedly require discrimination fall within the "essence" of the particular business. Johnson Controls, 499 U.S. at 206. Stated differently, overt discrimination "is valid only when the essence of the business operation would be undermined" if the business eliminated its discriminatory practice or policy. Dothard, 433 U.S. at 332.

---

[5]  The "plain language" of the BFOQ statutory exception, which applies equally to sex and national origin discrimination, makes case law discussing the BFOQ exception in the context of sexual discrimination applicable.

The defendant has offered essentially three reasons for its claimed practice of requiring employees to speak more English than does Mr. Claudio, none of which achieves the status of a legitimate BFOQ.

The "major reason" articulated by defendant is that the racking, plating and unracking jobs at Berkshire since November 2003, have been non-repetitive with fewer parts, more complex and of shorter duration.  Oddly, the defendant ignores months of discovery, hundreds of pages of deposition testimony, and hundreds of documents supporting the fact that essentially nothing has changed at Berkshire from before Mr. Claudio was terminated to the present.  Rather, the only evidence defendant provides in support of its motion is a 14-page affidavit of Mr. Schulz.[6] Mr. Schulz spends countless pages of his affidavit carefully cataloguing what we can only guess is part of the racking and plating processes presumably attempting to show the complexity of the processes at Berkshire.  However, none of these chemical processes were ever explained to the rackers or platers at Berkshire at any time prior to November 2003 or since.  (SOF 10.)  It was simply not essential to the business that the platers or rackers know the chemical processes. (SOF 7, 9, 10, 11, 12.)   Mr. Robles, Mr. Claudio's co-worker who was deposed in this matter and who is also a plater, testified that he and his coworkers performed these functions and continue to perform them essentially unchanged through the present.  (SOF 2, 3, 6,7, 28, 29, 30, 32,,33, 34, 35, 36)  According to Mr. Robles, all that has changed since Mr. Claudio was terminated in 2003 is the physical location of the tanks on the shop floor.  (SOF 33.)   Mr. Robles made clear at his deposition that from his perspective as a plater at Berkshire, nothing has changed with respect to his job or with the racking, plating and

---

[6]  Mr. Schulz cannot submit a self-serving affidavit in an attempt to contradict his own testimony in discovery and prevail at summary judgment.  (cite)

unracking functions either before or after Mr. Claudio's termination in November of 2003. (SOF 33, 34)

Berkshire's own testimony also supports that the shop's functions and processes have remained virtually unchanged for years. (SOF 3, 6, 7, 16, 28,29, 32) According to Berkshire, the racking and plating processes have not changed in 15 years, (SOF 29), whereas the inspection process has remained the same for 20 years. (SOF 32.)

It is also pure conjecture by the defendant who has no linguistics training, (SOF 19; Schulz Aff. para 4), that Mr. Claudio had insufficient English proficiency to perform his job, even if it had changed in some way as defendant would have the Court believe. The fact is Mr. Claudio performed well at the racking, plating, inspecting, weighing and packing functions for years. (SOF 27, 42, 43.) The defendant had no basis to believe Mr. Claudio would not continue to perform well as he had in the past. Nonetheless, Mr. Claudio was terminated when others less senior and experienced were retained. (SOF 64, 65, 66, 67, 68, 72, 75.) Mr. Claudio was never rehired when he called looking for a job nor when he responded to the defendant's advertisement for what was essentially his job. (SOF 69-75.) The defendant cannot now assert that an amorphous level of English proficiency has now, all of a sudden, become a BFOQ without a factual showing why it is necessary when it was unnecessary in the past.

The defendant asserts that another "reason" for the English proficiency "requirement" is some amorphous safety concern. In her deposition, Ms. Desjardins speculates that some level of English proficiency is a BFOQ because platers work with "dangerous chemicals" and so, somehow, a level of English proficiency is required. (SOF 57.) However, a BFOQ may not be based on "stereotyped

11

characterizations" <u>Dothard</u>, 433 U.S. at 333. An employer may only rely on a BFOQ

exception by proving that it has a factual basis for believing, that all or substantially

all people with limited English proficiency would be unable to perform their job duties

safely and efficiently. <u>Id.</u> at 333. The defendant here provides no factual basis for a

claimed safety concern. To the contrary, the defendant could not recall any injuries

relating to chemicals or lack of safety with chemicals or other substances throughout

the years at Berkshire. (SOF 57.) Even more to the point, Mr. Claudio worked with

the alleged dangerous chemicals on a daily basis throughout his employment and

was never injured. (SOF 57.) A vague and unsubstantiated claim of a safety issue

does not rise to a BFOQ.

The last reason proffered by the defendant purports to be a claim relating to a

lack of efficiency. Berkshire claims that it is no longer possible for other bilingual

employees of Berkshire to translate instructions from English to Spanish for Mr.

Claudio. This allegation is without merit and cannot be proven. It is important to note

that most of the time Mr. Claudio would simply get his assignment and instructions

and complete his work. (SOF 45, 52.) If Mr. Claudio needed more information to

complete an assignment, Ms. Desjardins would occasionally have one of three

coworkers translate for Mr. Claudio. (SOF 47.) All three coworkers were always

willing and able to do so. (SOF 48.) Ms. Desjardins would choose the coworker to

translate a particular instruction based on their physical proximity to Mr. Claudio.

(SOF 47.) The coworker most often in closest proximity to Mr. Claudio was Juan

Robles. (SOF 50.) By Mr. Robles' own account, he only translated for Mr. Claudio

once or twice per week. (SOF 49.) Mr. Robles estimated that each translation took

up to three minutes at a time. (SOF 50.) Thus, even if each of the three coworkers

who translated for Mr. Claudio did so on a twice weekly basis, that would amount to

no more than 18 minutes of translation per week.  (SOF 47.)  This is hardly the kind of efficiency claim that will rise to a BFOQ as a matter of law.

Finally, the cases cited by the defendant in support of its claim of BFOQ are easily distinguished.  Unlike Mr. Claudio, each plaintiff in the cited cases sought a customer or client service related job.  Because those positions were customer or client oriented, communication skills could be considered a requirement of the job. See Fragante v. City and County of Honolulu, 888 F.2d 591, 597 (9th Cir. 1989) (Recognizing that requiring communication skills may be a proxy for national origin discrimination.  However, a clerk's position that requires orally providing information over the phone and in person to an English speaking public and where job announcement listed the ability to "deal tactfully and effectively with the public" may require the applicant to communicate effectively in English.); Garcia v. Rush-Presbyterian-St. Lukes Medical Center, 660 F.2d 1217, 1222 (7th Cir 1981)(language fluency requirement is only legal when it is shown to be business necessity such as in the provision of medical services); Meija v. New York Sheraton Hotel, 459 F. Supp. 375, 377 (S.D.N.Y. 1978) (plaintiff was denied position because she performed poorly in office functions and because as a front office clerk she would have regular communication with hotel guests and her English was insufficient for that task); Healey v. Southwood Psychiatric Hosp., 78 F.3d 128 (3rd Cir. 1996)(defendants presented expert testimony that in treating sexually abused and emotionally disturbed adolescents counselors of both genders are required at all times so that adolescent could more freely disclose circumstances of sexual abuse, positive gender role modeling, privacy concerns, adolescent hygiene and sexuality issues so that gender was a job requirement.)

13

The defendant is unable to show that English language communication skills beyond those possessed by Mr. Claudio are essential either to the job performed by Mr. Claudio for six and a half years, or to any open position for which Mr. Claudio was qualified after his termination in November 2003. Mr. Claudio had no customer contact. He placed parts on a rack, dipped them into tanks of liquid metal, and, when they were ready, took the parts off the rack and visually inspected them. These processes are learned by watching someone else work, by on the job training and by trial and error. The process is the same, whether one or one-thousand parts are plated in a job. This is the same job performed by all of the rackers or platers at Berkshire and has been performed in substantially the same manner for over 15 years. For all but perhaps 18 minutes per week Mr. Claudio did his job with no need for English translation. Construing the facts in a light most favorable to Mr. Claudio for purposes of this motion, Berkshire has not provided any factual basis for why more English proficiency than that of Mr. Claudio's is a bona fide occupational qualification and summary judgment should be denied.

### D.   THE PLAINTIFF HAS PRESENTED SUFFICIENT PROOF TO ESTABLISH EACH OF THE ELEMENTS OF A PRIMA FACIE CASE OF DISCRIMINATION USING CIRCUMSTANTIAL EVIDENCE.

#### 1.  Plaintiff proves a prima facie case of discriminatory termination

To prove his termination case through circumstantial evidence Mr. Claudio must show that he is a member of a protected classification, he was qualified for the position, he was discharged and that other similarly situated employees who were not members of the protected class were treated more favorably. Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 673 (1st Cir. 1996).

Here, plaintiff has presented sufficient evidence on the elements of a prima facie case of discriminatory termination.  First, it is undisputed that he is a member of

14

a protected class being a Hispanic man.  It is of no consequence that Berkshire

claims to have employed other Hispanics.    As discussed more fully above, the law

recognizes that an employer cannot discriminate against a sub-class of Hispanics or

Puerto Ricans who have limited English proficiency and that "the primary language of

an individual is often an essential national origin characteristic."  29 U.S.C. 1606.7.

See generally Mejia v. New York Sheraton Hotel, 459 F.Supp. 375 (D.C.N.Y. 1978);

Carino v. Univ. of Oklahoma Board of Regents, 750 F.2d 815, 819-20 (10th Cir.

1984).  Berke v. Ohio Dept. of Pub. Welfare, 628 F.2d 980 (6th Cir. 1980).

Discrimination based on language ability constitutes national origin discrimination.

Carino, 750 F.2d at 819-20.   Mr. Claudio has also shown that he was qualified for

the position he held and had good performance, good attendance, good productivity

and good quality control.  (SOF 42, 43, 56.)   The fact that plaintiff was discharged is

uncontested.

    Lastly, Plaintiff has also shown that his discharge was under circumstances

giving rise to an inference of discrimination.   Several factors give rise to such an

inference.   Mr. Claudio was laid off in November 2003, despite his not having the

least seniority.  (SOF 64, 65.)  Berkshire acknowledges, however that its policy was

to layoff based on reverse seniority and it failed to follow its own policy.    (SOF 64.)

Defendant also admits that Mr. Claudio's lack of English was the reason he was

selected for termination which is impermissible.   See Carino, 750 F.2d at 819.

Within a few months of plaintiff's termination, a job that was substantially his position

was advertised and at least 3 people not in plaintiff's protected sub-class were hired

to do the tasks that Mr. Claudio had been capably performing.  (SOF 70, 71, 73, 74.)

This evidence easily satisfies the elements of plaintiff's *prima facie* case of wrongful

termination.

15

### 2. Plaintiff proves a prima facie case of failure to hire

In order to establish a *prima facie* case of national origin discrimination in an employer's failure to hire decision, the plaintiff must show that he is a member of a protected group, he was qualified and applied for a position, he was rejected for the position despite his qualifications and other equally or less qualified employees who are not members of the protected group received the position. <u>See</u>, <u>Fragante v. City and County of Honolulu</u>, 888 F.2d 591 (9th Cir. 1989).

In addition to the elements discussed at pages 14-15 above, Mr. Claudio can show that he was neither recalled nor hired to any position with Berkshire after his termination.  The defendant offers no evidence to dispute that Mr. Claudio applied for the various positions that came open after he was terminated.  Mr. Claudio called Ms. Desjardins on a number of occasions looking for employment. (SOF 69, 70.)  He also called her looking to be considered when the position that was substantially the same as his came open and was advertised in the newspaper.  (SOF 69, 70.) Ms. Desjardins told Mr. Claudio that there was no position for him at that time, nor was Mr. Claudio ever offered a position with Berkshire after he was terminated.  (SOF 71,76, 77.)

A number of factors give rise to the inference that Mr. Claudio was not hired due to discrimination based on his national origin.  There is no dispute that at least three positions were filled after Mr. Claudio's termination by people who were not in the protected sub-class. (SOF 73.)  Elizabeth Gillette and Marcin Jandzis who are not Hispanic were hired respectively and most recently after the advertisement ran for Mr. Claudio's job.  Mr. Claudio was at least as qualified as those people who were hired for the open position that was advertised, (SOF 75), and he was told he was not hired due to "lack of English". (SOF 62.)

16

### E.  THERE IS OVERWHELMING EVIDENCE THAT THE REASONS NOW OFFERED BY THE DEFENDANT FOR TERMINATING AND FAILING TO HIRE MR. CLAUDIO ARE MERE PRETEXTS FOR DISCRIMINATION

Once a plaintiff in a Title VII case has made out a *prima facie* case of discrimination, a legal presumption of unlawful discrimination arises and the burden shifts to the defendant employer to produce evidence of a legitimate, non-discriminatory reason for the employee's rejection. Lockridge, 294 F.3d at 1014.  If the employer meets this burden of production, the plaintiff then must establish that the defendant's proffered reasons for hiring someone of a different race are pretexts for discrimination. Id.; See also Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The Supreme Court has found that discriminatory intent may be inferred from the simple showing of pretext.  "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2109 (2000). The Court similarly observed in St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 2749, 125 L. Ed.2d 407 (1993) that "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." Consequently, because a jury may find illegal discrimination upon nothing more than a *prima facie* case and pretext, such a showing at the summary judgment stage is sufficient to get the case to the jury. Randle v. City of Aurora, 69 F. 3d 441, 451-52 (10th Cir. 1995).

One way a plaintiff can establish pretext is by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

17

proffered legitimate reasons" such that a factfinder could "infer that the employer did not act for the asserted non-discriminatory reasons." <u>Santiago-Ramos v. Centennial P.R, Wireless Corp.</u>, 217 F. 3d 46, 56 (1st Cir. 2000)(citation omitted). The factual record in this case reveals that there are glaring and irreconcilable inconsistencies and contradictions in the reasons asserted by the Defendant for terminating Mr. Claudio and for subsequently failing to hire him.  Here, the reasons have morphed over time. The reasons for this change are obvious: the original explanation asserted by the Defendant was both impermissible on its face and simply did not stand up to factual scrutiny once tested in litigation, and the Defendant needed to find replacements.  This shifting of reasons cast serious doubt on the credibility of any of the proffered reasons as explained below but it is first necessary to examine the numerous reasons offered by the defendant for the adverse actions taken against Mr. Claudio.

### 1.    Various Reason Offered By Berkshire

Over time, the reasons given by the defendant for the adverse employment actions against Mr. Claudio have included:

- "lack of English"

- inability to follow oral instructions

- inability to follow written instructions

- increased complexity of Berkshire's work

- lack of work

- bilingual employees can no longer translate for Mr. Claudio

As set forth below, each of the alleged legitimate non-discriminatory reasons asserted by defendant over a period of two years turns out to be factually unsustainable.

18

### a) Lack of English

The defendant offered its first and only reason for its firing and then not hiring Mr. Claudio in a verified statement to the Massachusetts Commission Against Discrimination. That reason was a "Lack of English." The defendant has spent the better part of two years trying to back away from this impermissible reason. The adverse treatment of employees or applicants who have limited English abilities is discriminatory if the jobs they seek can be performed without knowledge of that language. Garcia v. Gloor, 618 F.2d 264, 269 (5th Cir. 1980). See Carino v. University of Oklahoma Bd. of Regents, 750 F.2d. 815 (10th Cir. 1984)(employer liable under Title VII for declining to hire the plaintiff, who had a noticeable Filipino accent, for a position as supervisor of a dental laboratory. The plaintiff's language skills did not interfere with his ability to perform supervisory tasks and language skill limitations that do not interfere with a person's ability to do his job is not a legitimate justification for adverse employment decisions); Odima v. Westin Tucson Hotel Co., 991 F.2d 595 (9th Cir. 1993)(plaintiff's language ability did not interfere with his ability to perform his job and the decision not to hire him constituted national origin discrimination); Xieng v. People's National Bank of Wash., 821 P.2d 520 (Wash. App. 1991), aff'd. 844 P.2d 389 (Wash. 1993) (discrimination based on national origin because plaintiff's language abilities did not interfere materially with employee's job performance; employer must demonstrate a factual basis for its evaluation of the employee's job performance -- particularly where plaintiff had been acting in the position for at least eight months).

As discussed at pages 10-14 above, the plaintiff capably did his job and could perform all the necessary tasks for the jobs that were open and filled after his termination. He was certainly fully capable of performing the duties of the position

that was advertised at Berkshire in the Spring of 2004, shortly after his termination. (SOF 56, 70, 73, 74, 75.)  At a minimum, there is a dispute of fact as to whether the defendants claimed policy – requiring English proficiency—is necessary to Berkshire's business or is, as the plaintiff demonstrates a pretext for discrimination.

### b)  Inability to follow written instructions

At her deposition Ms. Desjardins claimed that there was an unwritten policy that employees be able to "read and understand" instructions in English.  (SOF 57.) Construing the facts in a light most favorable to Mr. Claudio, employees were never required to read any instructions while at work at any time.  (SOF 53-55.)  Any claim that an employee be proficient in reading and understanding written English is clearly pretextual.

### c)  Inability to follow oral instructions

Presumably at Mr. Claudio's coworker's deposition it became clear to defendant that its claim that platers and rackers need to be able to read and comprehend written instructions was untenable.  Mr. Robles clearly stated that he had never received any written instructions during his ten years as a plater at Berkshire.  (SOF 54.)  Magically, the proffered reason for the adverse actions Berkshire took against Mr. Claudio again transmogrified.  The defendant now claims that Mr. Claudio could not follow *oral* instructions.  The evidence simply belies this contention.  As set forth in detail above, Mr. Claudio was well qualified to rack, plate, inspect, pack and weigh parts.   He did these job duties, regularly, well and with little or no translation necessary.  Nonetheless, Mr. Claudio was terminated when others with less seniority and experience were not and was passed over for hire when Berkshire sought to fill a position substantially the same as Mr. Claudio's. (SOF 56, 70, 73, 74, 75.)  Moreover, the vague safety concerns articulated by the defendant

are unsupported.  There have been no injuries on the job to anyone, including Mr.

Claudio.  (SOF 57.) Similarly, there is no evidence that Mr. Claudio performed in any

manner that can be deemed unsafe in any way or has failed to follow oral instructions

and the proffered reason is clearly a pretext.

### d)  Increased complexity of Berkshire's work

Berkshire offers another reason that is simply untrue.  There is no evidence to

suggest that Berkshire's work has changed over the years in any measurable way.

The best the defendant can come up with is that the jobs are shorter, with fewer parts

per job.  Even Berkshire's principals generally testified under oath that the processes

have not changed.  (SOF 2, 3, 6,7, 28, 29, 30, 32,,33, 34, 35, 36)  Mr. Robles a

candid current employee of Berkshire also testified at his deposition, under oath, with

his boss looking on, that nothing has changed at Berkshire with respect to the

various aspects of the plating process for years other than the physical location of the

tanks on the shop floor.  (SOF 33.)  The evidence supports the conclusion that the

job has not changed even in this immaterial way either prior to or since Mr. Claudio's

termination and supports the conclusion that this proffered reason is a pretext.

### e)  Lack of work

There is no support for this claim other than a conclusory, unsupported and

self-serving affidavit of Mr. Schulz contradicting his own prior testimony.  More telling

is that several people were newly hired after Mr. Claudio's termination to do

essentially the same tasks he did prior to his termination. (SOF66-68, 73-75.) Federal

courts have widely recognized that evidence showing that an employer hired a less

qualified, less experienced individual over the plaintiff is probative of whether the

employer's proffered reason for not hiring the plaintiff to that position was pretextual,

and thus supports an inference of discrimination. See  Williams v. Pharmacia, Inc.,

137 F.3d 944 (7th Cir. 1998); <u>Bass</u>, 256 F.2d at 1107 ("Hiring a less qualified person

can support an inference of discriminatory motivation"); <u>Lee v. GTE Florida</u>, 226 F.3d

1249, 1253 (11th Cir. 2000).   The only reasonable inference based on the evidence

is that the claim of a lack of work is a pretext.

### f)   Bilingual employees can no longer translate for Mr. Claudio

The defendant simultaneously claims a lack of work and that bilingual

employees are now too busy to translate for Mr. Claudio.  This new-fangled reason

cannot pass muster.  Mr. Robles, who worked next to Mr. Claudio on the shop floor

and who did much of the translation for Mr. Claudio testified that he spent no more

than six minutes per week translating for Mr. Claudio.  (SOF 49, 50.)  Viewing the

facts in a light most favorable to Mr. Claudio, it is impossible to see how this

translation would be too onerous for his coworkers.  None of those employees asked

to translate ever had any objections and were always willing and able to do so.  (SOF

48.)  The defendant presents no evidence in support of any reason why translation

has become more burdensome for defendant or its employees.

### 2.   Shifting reasons for the adverse actions taken against Mr. Claudio is sufficient to put this case to a jury

Undaunted by these stark contradictions which exist between the competing

reasons proffered by defendant for its adverse employment actions, the Defendant

now asks this court to conclude that there is **no** factual dispute that the new and

shifting reasons posited by the Defendant for its actions are the real reason for its

actions. The word "audacity" comes to mind. The First Circuit has recognized that

one way to establish pretext is to show that an employer's proffered non-

discriminatory reasons are "after-the-fact justifications, provided subsequent to the

beginning of legal action. <u>Santiago-Ramos</u>, 217 F.3d at 56.  As in the <u>Santiago-

Ramos</u> case, a jury in this case could reasonably conclude from the inconsistencies

and contradictions which exist between the non-discriminatory reasons proffered by the Defendant that the new reasons are "merely pretextual post hoc justifications" provided long after the institution of legal proceedings. Id. Evidence of pretext in this case is not limited to the glaring contradictions that exist between the non-discriminatory reasons recently proffered by the Defendant and its earlier explanations for its actions. As has been set forth above, there is considerable evidence to support an inference that the myriad of newly proffered non-discriminatory reasons are false and exist only as a pretext for unlawful discrimination against the Plaintiff.

As noted above, the First Circuit has also recognized that a jury could reasonably infer from the implausibility of proffered non-discriminatory reasons that the reasons are pretexts for discrimination. Id. If the new reasons proffered were the real reasons, there is simply no plausible explanation for its failure to mention many of these reasons prior to the filing of its Motion for Summary Judgment. The Defendant certainly had every opportunity to do so.

## CONCLUSION

WHEREFORE, the plaintiff requests that the Court deny the defendant's motion for summary judgment.

CARLOS CLAUDIO COTTO
By his attorney,


_____/s/ Suzanne Garrow_____
Suzanne Garrow BBO # 636548
Heisler, Feldman, McCormick & Garrow P.C.
1145 Main Street, Suite 508
 Springfield MA  01103
(413)788-7988
(413)788-7996 (fax)

Dated: February 10, 2006