UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        :
CARLOS CLAUDIO COTTO,                   :
                                        :
        Plaintiff,            :    DOCKET NO.  3:04-cv-30216-KPN
                                        :
v.                                      :
                                        :
BERKSHIRE MANUFACTURING                 :
CORPORATION,                            :
        Defendant.            :
_____:

**PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED**

There exists a genuine issue with respect to the following material facts, and, for purposes of the Defendant's pending Motion for Summary Judgment, these facts must be construed in a light most favorable to Plaintiff Carlos Claudio Cotto.

*Berkshire Manufacturing Corporation*

1.    Donald Schulz is the President and Chief Operating Officer of Berkshire Manufacturing Corporation and has held those positions since he began the business began in or around 1983.  (Affidavit of Donald J. Schulz, Document 25 ("Shulz Aff."), para. 1-2.)

2.    Berkshire's sole business is plating and finishing various customer's parts, the vast majority of which are metal.  (Deposition of Donald Schulz ("Schulz Dep.") pages 9-10, attached to Affidavit of Suzanne Garrow at Exhibit 1 ("Ex.1").)

3.    Since its inception, Berkshire has performed these functions and also packs the parts to be returned to the customers after plating.  (Shulz Dep. pages 10-11, Ex. 1; Schulz Aff. para 1-2.)

4.  Berkshire employed 15 full-time employees at the time Mr. Claudio was terminated in November 2003. (Answers and Objections of Defendant to Plaintiff's Interrogatories, ("Def. Ans. Ints.") at Exhibit A, attached to Affidavit of Suzanne Garrow at Exhibit 2 ("Ex. 2").)

5.  When Mr. Schulz started Berkshire it was a "two-man" operation, with one plater and one inspector, however, the operation grew over the years. (Schulz Dep. page 14, Ex. 1;Deposition of Roberta Desjardins ("Desjardins Dep.") pages 28-29, attached to Affidavit of Suzanne Garrow at Exhibit 3 ("Ex.3").)

6.  At that time, Mr. Schulz and Roberta Desjardins plated and finished parts. (Schulz Dep. page 15, Ex. 1.)

7.  Mr. Schulz learned the plating process by watching someone else and, even today, the same process is repeated for every part that is plated. (Schulz Dep. page 18, Ex.1.)

8.  The process was taught to new hires over the years by someone physically showing them what to do. (Desjardins Dep. page 30, Ex. 3.)

9.  While there are a number of steps to plating, the process used for each tank in which a part is dipped, is essentially the same. (Schulz Dep. pages 30-31, Ex.1.)

10. None of the chemical processes were ever explained to the platers; rather, the platers were simply told which tanks to use and when. (Deposition of Carlos Claudio Cotto ("Claudio Dep") pages 89-90, attached to Affidavit of Suzanne Garrow at Exhibit 4 ("Ex. 4").)

11. The information necessary to plate is attained through job knowledge. (Schulz Dep. page 32, Ex. 1.)

12.     For example, if a plater had previously worked with a particular metal, that plater would have the needed job knowledge to work with the metal again  (Schulz Dep. pages 32-33, Ex. 1.)

13.     At the time Mr. Claudio was hired by Berkshire in mid-1997, Roberta Desjardins was Berkshire's plant manager and had been so for most of her over 20 year career with Berkshire.  (Desjardins Dep. pages 8, 11, 27, Ex. 3.)

14.     Ms. Desjardins began as an inspector and after she worked at Berkshire for around two years, she began plating parts. (Desjardins Dep. pages 8, 21, Ex. 3.)

15.     Ms. Desjardins learned how to plate by watching Mr. Schulz, and by trial and error.  (Desjardins Dep. page 21, Ex. 3.)

16.     Ms. Desjardins is a working manager and uses many similar techniques in the shop today that she used when she began at Berkshire 20 years ago.  (Desjardins Dep. page 11, Ex. 3.)

17.     Ms Desjardins is getting ready to retire at this time and, since planning to do so, has cut her work hours to about eight hours per day.  (Desjardins Dep. page 8, Ex. 3)

18.     Several months prior to Mr. Claudio's termination, Stephen Rapacki was hired as a co-manager with Ms. Desjardins and to replace Ms. Desjardins as plant manager when she retires.  (Schulz Dep. page 48, Ex. 1.)

19.     Other than on-the-job training, Ms. Desjardins' highest level of education attained was the ninth grade, she did not achieve a high school equivalency nor did she ever attend technical school.  (Desjardins Dep. page 31, Ex. 3)

### *Mr. Claudio's Over Six ½ Year Tenure at Berkshire Racking, Plating, Inspecting, Weighing and Packing Parts*

20.     Carlos Claudio Cotto ("Mr. Claudio") was hired to work at Berkshire Manufacturing Corporation ("Berkshire") in July, 1997, by Roberta Desjardins ("Ms.

3

Desjardins"). (Claudio Dep. pages 80-81, Ex. 4; Affidavit of Donald J. Schulz, Document 25 ("Shulz Aff."), para. 2.)

21.	Mr. Claudio was hired as a racker of parts. (Claudio Dep. page 82, Ex. 4.)

22.	As a racker he would place the parts on a rack and after they were plated by the plater, Mr. Claudio inspected the parts and then packed them. (Claudio Dep. pages 75-76, Ex. 4.)

23.	At the time he was hired, Mr. Claudio had no experience and learned the various techniques necessary through on-the-job training by managers and coworkers. (Claudio Dep. pages 81, 83, Ex. 4.)

24.	Mr. Claudio is a high school graduate. (Claudio Dep. page 55, Ex. 4.)

25.	Sometime shortly into his tenure with Berkshire, Mr. Claudio was given increased responsibility and began plating parts. (Desjardins Dep. page 49, Ex. 3.)

26.	He learned plating through on-the-job training by coworkers. (Claudio Dep. pages 83-85, ex. 4)

27.	Mr. Claudio's job duties then included racking, unracking, packing, plating and inspecting parts. (Desjardins Dep. page 49, Ex. 3; Claudio Dep. page 23, Ex. 4.)

28.	These job functions of racking and plating at Berkshire which include unracking, packing, plating and inspecting parts have not changed since around 1997. (Desjardins Dep. pages 41-44, Ex. 3).

29.	The process for plating parts such as those plated at Berkshire has remained similar for fifteen years and remains the same through the present. (Schulz Dep. page 38, Ex. 1)

30.	All that changed while Mr. Claudio worked at Berkshire was the physical location of tanks on the shop floor. (Claudio Dep. pages 35-36, Ex. 4).

4

31. To inspect the parts plated by Berkshire, they are visually checked for imperfection and whether the parts meet the necessary standards is simply a matter of common sense. (Desjardins Dep. pages 26, 30, Ex. 3.)

32. That technique has not changed for at least 20 years. (Desjardins Dep. pages 26, 30, Ex. 3.)

33. According to Juan Robles, a plater at Berkshire and coworker of Mr. Claudio, he has observed no changes in the racking, plating, inspecting or packing of parts since prior to when Mr. Claudio was terminated in 2003 through the present other than location of the tanks on the shop floor. (Deposition of Juan Robles ("Robles Dep.") pages 15-16, attached to Affidavit of Suzanne Garrow at Exhibit 5 ("Ex. 5").)

34. Like Mr. Claudio, Mr. Robles has observed no changes in his job duties or the job duties at Berkshire in general since he began his employment in 1995, which were the same duties as those of Mr. Claudio. (Robles Dep. pages 15, 24, 68, Ex. 5; Claudio Dep. pages 35-40, Ex. 4)

35. The only way in which Berkshire claims that it has changed over time was that the jobs became shorter runs with fewer pieces. (Desjardins Dep. page 44, Ex. 3.)

36. That change occurred between 15 and 20 years ago. (Schulz Dep. page 22, Ex. 1.)

37. At some point during his tenure, Mr. Claudio worked on a job for a customer Eaton Corporation. (Desjardins Dep. page 48, Ex. 3.)

38. Mr. Claudio simultaneously did work for other customers. (Claudio Dep. page 49, Ex. 4.)

39.  Berkshire lost the Eaton job in or around November 2001, and Mr. Claudio used his same skills on other jobs for a number of different customers until he was terminated in November 2003. (Desjardins Dep. page 49; Schulz Aff. para. 18.)

40.  Mr. Claudio used those same skills to work on numerous parts throughout his years with Berkshire and was cross trained to perform Berkshire's various functions. (Claudio Dep. page 87, Ex. 4; Schulz Dep. page 46, Ex. 1.)

41.  At one point in his tenure, while on layoff, Mr. Claudio worked for National Metal Company and did plating for them as well. (Claudio Dep. page 74, Ex. 4.)

42.  Mr. Claudio was a good worker, with no negative performance issues and with good performance including very good attendance, putting out the necessary quantity and quality of work and he creates no more "rejects" or damaged parts than his co-workers. (Schulz Dep. pages125-126, Ex. 1; Berkshire's Verified Massachusetts Commission Against Discrimination Position Statement, signed by Donald Schulz ("MCAD Position Statement", attached to Affidavit of Suzanne Garrow at Exhibit 6 ("Ex. 6").)

43.  Mr. Schulz and Ms. Desjardins both acknowledge that Mr. Claudio was a good worker, diligent, and performed his various job duties at least as well as the other workers throughout his tenure. (Schulz Dep. pages 73, 74, ex. 1; MCAD Position Statement, Ex. 6; Desjardins Dep. pages 58-59, Ex. 3.)

44.  Despite his good work, Mr. Claudio never received a raise in the entire time he worked for Berkshire while many of his coworkers did. (Claudio Dep. pages 135-38, ex. 4.)

45.  Mr. Claudio understood mostly all instructions given to him by Ms. Desjardins throughout his tenure. (Claudio Dep. page 97, Ex. 4; Robles Dep. page 14, Ex. 5.)

46.   If he had any questions after receiving instructions, Mr. Claudio would ask his coworkers or Ms. Desjardins for clarification or, when necessary, translation. (Claudio Dep. page 97, Ex. 4; Robles Dep. page 14, Ex. 5.)

47.   Ms. Desjardins would ask one of three of Mr. Claudio's coworkers who spoke Spanish to translate a particular instruction when necessary, depending on who was in physical proximity to Mr. Claudio.  (Desjardins Dep. page 88, Ex. 3.)

48.   All three coworkers were willing and able to translate for Mr. Claudio. (Desjardins Dep. page 104, Ex. 3).

49.   Coworker Juan Robles translated for Mr. Claudio once or twice per week. (Robles Dep. page 61, Ex. 5)

50.   Most times it took him about three minutes to translate an instruction.  (Robles Dep. page 65., Ex. 5.)

51.   Mr. Robles, who very often worked side by side with Mr. Claudio, testified that after a clarification by Ms. Desjardins or Mr. Robles, Mr. Claudio would then be able to complete his work.  (Robles Dep. pages 11, 15, Ex. 5.)

52.   Mr. Robles often observed Mr. Claudio getting his assignments and simply going to do his work without clarification or translation.  (Robles Dep. page 14, Ex. 5.)

53.   At no time during his tenure did Mr. Claudio need to know how to read or write English to perform his job duties of racking, plating, inspecting , packing or weighing. (Claudio Dep. page 17, Ex. 4.)

54.   According to coworker Juan Robles, he has never received, nor has he been asked to follow, nor has he seen any written instructions for any process during his entire tenure at Berkshire, which began in 1995 and continues through the present. (Robles Dep. pages 12-13, Ex. 5)

55.  Mr. Claudio never saw any written instructions for any job or job duty at Berkshire. (Claudio Dep. pages 125-26, Ex. 4.)

56.  Mr. Claudio was capable of racking and inspecting all the parts that were being made around November 2003. (Claudio Dep. page 115, Ex. 4.)

57.  Ms. Desjardins testified at oral deposition that there was an unwritten "policy" that employees be able to "read and understand instructions" in English and that the "policy" was due safety because platers work with "dangerous chemicals". (Desjardins Dep. page 79, Ex. 3.)

58.  There has been no workers' compensation injuries at all for over four years at Berkshire and the only injury Ms. Desjardins could recall was a back stress injury. (Desjardins Dep. pages 79-80, Ex. 3.)

59.  No written policy has ever existed requiring employees to communicate in English    (Schulz Dep. pages 120-121, Ex. 1; Robles Dep. page 67, Ex. 5).

### Mr. Claudio's Termination and Berkshire New Hires Post-Termination

60.  Mr. Claudio was terminated or, as Berkshire claims, "laid off" in November 2003. (Schulz Aff. para 23.)

61.  Ms. Desjardins and Mr. Schulz have provided a post-facto reason for terminating Mr. Claudio's employment in November 2003, which is the "lack of work." (Desjardins Dep. page 58, Ex. 3; Schulz Aff. para 23.)

62.  This is contrary to the only reason provided in Berkshire's verified response provided by Mr. Schulz to the MCAD which clearly stated that he was fired due to his "lack of English." (MCAD Position Statement, Ex. 6.)

8

63. The work load at Berkshire did not appear to be decreased in any way at the time Mr. Claudio was laid off. (Claudio Dep. pages 113, 115, Ex. 4)

64. Despite Berkshire's policy of retaining people with greater seniority, people with less experience and a shorter tenure were not laid off in November 2003. (Claudio Dep. page 103, Ex. 4; Robles Dep. pages 22-23, Ex. 5.; Def. Ans. Ints. Exhibit A, Ex. 2; MCAD Position Statement, Ex. 6.)

65. The less senior, less experienced people retained performed many of the same tasks, albeit fewer than Mr. Claudio. (Claudio Dep. page 103, Ex. 4; Robles Dep. pages 22-23, Ex. 5.)

66. Cathy Corbin, Elizabeth Gillette and Carol Frank, all of whom were white and hired after Mr. Claudio, performed many of the same job functions as Mr. Claudio. (Robles Dep. pages 20-21, Ex. 5; Claudio Dep. pages 154-155, Ex. 4.)

67. Despite the defendant's claim to the contrary, they were not forepersons, they were never held out as supervisors in any way, and they never gave any instructions or had any supervisory capacity over their coworkers. (Robles Dep. pages 20-21, Ex. 5; Claudio Dep. pages 154-155, Ex. 4)

68. The company routinely continues to hire workers for racking, plating, or inspecting functions. (Def Ans. Ints. Exhibit A, B, Ex. 2.)

69. After he was terminated in November 2003, Mr. Claudio called Ms. Desjardins a number of times on a weekly basis to see if he could get hired back. (Claudio Dep. page 26, Ex. 4.)

70. Shortly after he was terminated from his employment, Mr. Claudio saw what was substantially his position advertised in the newspaper and called Ms. Desjardins

and applied for that position. (Advertisement, attached to Affidavit of Suzanne Garrow at Exhibit 7 ("Ex. 7"); Claudio Dep. pages 32, 127.)

71. Ms. Desjardins told Mr. Claudio that there was no position for him at that time. (Claudio Dep. pages 34, 127, Ex. 4.)

72. New full-time hires after Mr. Claudio was hired in July, 1997, who perform those functions that have been performed by Mr. Claudio:

   (A) Katherine Corbin: hired August 2001 (White)

   (B) Carol A. Frank: hired May 2001 (White)

   (C) Victor Rosado: hired February 22, 1999 (quit) (not of limited English

   proficiency)

   hired after quitting twice March 12, 2002

73. New full-time hires since Mr. Claudio's termination in November, 2003, who perform those functions that have been performed by Mr. Claudio:

   (A) Elizabeth M. Gillette: hired March 1, 2004 (White)

   (B) Cristobal Henriquez: hired June 28, 2004 (not of limited English proficiency)

   (C) Marcin Jandzis: hired June 11, 2004 (White)

   (Schulz Dep. pages 64-69, Ex. 4.; Def. Ans. Ints., Ex. 2.)

74. Berkshire hired a number of people to replace Mr. Claudio after his termination (Schulz Dep. pages 64-69, Ex. 4.; Def. Ans. Ints., Ex. 2.)

75. Many of the job duties performed by the above individuals were the same functions previously performed well by Mr. Claudio. (Def. Ans. Ints. at Exhibit A., Ex. 2; Schulz Dep. pages 138-140, Ex. 1; Robles Dep. pages 18-24, Ex. 5.)

76. Mr. Claudio was never offered any full-time positions that became available after his termination in November 2003, including those set forth above. (Affidavit of

Carlos Claudio Cotto ("Claudio Aff.") para 1, attached to Affidavit of Suzanne Garrow at Exhibit 8 ("Ex. 8").)

77.  Mr. Claudio was never offered a part-time position with Berkshire since his termination in November 2003.  (Claudio Aff. para 2, Ex. 8.)

          Respectfully submitted,

          PLAINTIFF CARLOS CLAUDIO COTTO
          By his Attorney,

Dated:  February 10, 2006       /s/ Suzanne Garrow

          Suzanne Garrow
          BBO# 636548
          Heisler, Feldman, McCormick & Garrow, P.C.
          1145 Main Street, Suite 508
          Springfield, MA 01103
          (413) 788-7988