UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-30216-KPN

_____
                                            :
CARLOS CLAUDIO COTTO,                       :
                                            :
                          Plaintiff,        :
                                            :
             v.                             :
                                            :
BERKSHIRE MANUFACTURING CORPORATION,        :
                                            :
                          Defendant.        :
_____ :

**DEFENDANT'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendant Berkshire Manufacturing Corporation ("Berkshire") respectfully submits this Reply Memorandum of Law, together with the accompanying reply affidavit of Donald J. Schulz ("Schulz") ("Schulz Reply Affidavit") and the affidavit of Juan Robles ("Robles") ("Robles Affidavit"), in further support of its motion for summary judgment.

**(1)   FACTUAL ALLEGATIONS OF CLAUDIO**

Before addressing the legal arguments of plaintiff Carlos Claudio Cotto ("Claudio")[1], it is necessary to correct the following salient factual misstatements and/or mischaracterizations, and the unsupported factual assertions, which are replete throughout

---

[1] Prior to Berkshire's receipt of his papers in opposition to this motion, neither plaintiff nor his counsel had advised Berkshire that plaintiff's correct surname was Claudio.

Claudio's opposition papers. Among other things, much of the testimony of Claudio and Robles which is relied upon by Claudio is either conclusory, not fact-specific, subjective, contradictory and/or concerns issues about Berkshire's business of which they have no competent knowledge and, consequently, is entitled to no weight. See <u>Diaz</u> v. <u>Crowley Liner Services, Inc.</u>, 281 F.Supp.2d 340 (D.Puerto Rico 2003); <u>Johnson</u> v. <u>Nordstrom, Inc.</u>, 260 F.3d 727 (7th Cir. 2001); <u>Quinones</u> v. <u>House Buick</u>, 2005 U.S.Dist. LEXIS 14230 (D.Mass. July 14, 2005), <u>aff'd</u>, 2006 U.S.App. LEXIS 2568 (1st Cir. February 2, 2006).

**(A) Berkshire Has Admitted That It "Fired" And Failed To Rehire Claudio Due To His "Lack Of English" And Claudio Was Told He Was Not (Re) Hired Because Of His Lack Of English**

Berkshire has not admitted that it laid Claudio off or failed to rehire him because of his "lack of English".

As stated in the initial Schulz Affidavit (¶¶ 17-23) and the Schulz Reply Affidavit (¶¶ 3-4), Berkshire laid Claudio off in November 2003 because as of October/November 2003 the amount of work at Berkshire had substantially declined. In particular, Berkshire no longer had enough of the simple, non-repetitive, long-term jobs which involved large numbers of parts ("Simple Jobs") on which Claudio had been working, or the volume of parts with respect to the Simple Jobs had substantially decreased.

In addition, since prior to and after November 2003 the jobs at Berkshire have become more complex, less repetitive and last for shorter time periods with significantly smaller numbers of parts ("Complex Jobs"). Therefore, it is now necessary to continuously instruct and supervise employees to insure that the racking and plating proce-

dures with respect to the Complex Jobs are performed correctly. And because of the necessity for such continuous instruction and supervision, it is no longer possible to utilize the bilingual employees at Berkshire to translate English instructions into Spanish for employees (like Claudio) since that would require the translating employees to spend too much time assisting in the translation and not enough time doing their own work. Consequently, Berkshire has not been able to rehire Claudio since November 2003 because there has not been a sufficient amount of racking/unracking work at Berkshire with respect to the Complex Jobs and, even if there were, Claudio is not able to perform the work because of his inability to understand oral instructions in English.[2]

Even if Claudio had sufficient knowledge about the business requirements of Berkshire, he did not testify, as he claims, that the workload at Berkshire had not decreased as of November 2003 (Claudio Deposition at 113) (SOF 63).[3]

The only support cited by Claudio for his allegations is the statement by Schulz in his March 29, 2004 letter to the MCAD (Exhibit I in Berkshire's Supplemental Exhibit Appendix) that the "problem [with Claudio] was in his lack of English" (SOF 62). How-

---

[2] As Berkshire previously stated (initial Schulz Affidavit at ¶ 8, n2), while written instructions may be utilized (see, e.g., Schulz Deposition at 33), Berkshire's rackers and platers were primarily given oral instructions. Therefore, contrary to the allegation of Claudio (Claudio Opposition Memorandum at 20), Berkshire is not claiming that the inability of Claudio to understand written instructions had any impact on Berkshire's decision to lay Claudio off or to not rehire him (assuming there had been sufficient work for him to do).

[3] Berkshire will primarily address the record citations upon which the statements of fact ("SOF") in Claudio's Concise Statement Of Material Facts which are cited in his Opposition Memorandum are predicated, rather than the conclusory (and often inaccurate) statements (allegedly) predicated on such citations. The deposition pages of Claudio, Schulz, Desjardins and Robles referred to herein are contained in Defendant's Supplemental Exhibit Appendix In Connection With Defendant's Motion For Summary Judgment ("Berkshire's Supplemental Exhibit Appendix") as Exhibits E, F, G and H (respectively). Because of its length, Berkshire's Supplemental Exhibit Appendix is being filed with the Court by mail, rather than electronically.

ever, the letter does <u>not</u> state that Berkshire laid Claudio off because of his "lack of English". In addition, as explained in the Schulz Reply Affidavit (¶ 5) and as is indicated by the context of the following entire paragraph in the letter, the reference to Claudio's "lack of English" merely referred to the fact that <u>even if Berkshire obtained a sufficient amount of work in the future</u> it would be difficult to rehire Claudio because he would not be able to perform the Complex Jobs which existed at Berkshire given his inability to understand oral instructions in English, not that Berkshire had laid Claudio off because of his "lack of English".

> In the case of Mr. Cotto, Berkshire acknowledges that he was a good worker with good attendance. The problem was in his lack of English. The work that Berkshire does is changing rapidly and is now much more technical and precise with a higher demand on being able to communicate rapidly and effectively. Berkshire has just completed a move into a completely new area of the building with hopes of being able to compete in a very difficult environment. <u>If we can find work for Carlo in the future we will do so</u>. However, there are no guarantees. We have no animosity toward Carlos and applaud his desire to work and support his family. [emphasis supplied].

Furthermore, Claudio testified that the only reason he was told that he was being laid off in November 2003 was that the work at Berkshire was slow and that no one told him he was being laid off because he could not understand English (Claudio Deposition at 114-116) (<u>see</u> Robert Desjardins ("Desjardins") Deposition at 62 (<u>infra</u>)), and the only evidence cited by Claudio in support of his allegation that he was "told" he was not rehired because of his lack of English is Schulz's March 29, 2004 letter to the MCAD (Claudio Opposition Memorandum at 16) (SOF 62) which, as noted above, is not accurate.

Therefore, Berkshire has not admitted that Claudio was laid off or not rehired,

4

and Berkshire did not tell Claudio he was not rehired, because of his lack of English, and no questions of fact are presented with respect to the same.

**(B) The Nature Of Berkshire's Business Has Not Changed
Since November 2003 When Claudio Was Laid Off**

As stated in the initial Schulz Affidavit (¶¶ 18-21, 26-29), the nature of the work at Berkshire has been changing for a number of years.  Berkshire is no longer able to attract Simple Jobs like those on which Claudio worked.  Now (and as of November 2003) most of the jobs at Berkshire are much more Complex Jobs.  As a result and in contrast to the instructions with respect to the Simple Jobs, not only are the instructions regarding the racking and plating of parts for most of the work at Berkshire more complicated and required to be given continuously, but the rackers/platers must constantly be given additional, supplemental instructions with respect to the Complex Jobs to avoid problems with the racking and plating processes.

In this connection it should be noted that although the <u>nature of the work and "processes"</u> at Berkshire -- polishing, buffing, racking, plating and unracking parts -- have generally remained the same, the nature of the <u>jobs</u> at Berkshire have changed from the Simple Jobs on which Claudio worked from 1997 through November 2003 (which have substantially declined) to the Complex Jobs (<u>see</u> initial Schulz Affidavit at ¶¶ 18-21, 26-29 and Schulz Reply Affidavit at ¶¶ 3-4).[4]

The only evidence cited by Claudio that the nature of the <u>jobs</u> at Berkshire has

---

[4] Contrary to Claudio's implication (Claudio Opposition Memorandum at 10), Berkshire does not maintain that rackers or platers were required to know any "chemical processes".  Rather, it is critical for the rackers and platers to be able to understand instructions regarding (among other things) which racks to utilize, how to correctly place parts on the racks, the correct sequence and timing for immersing the racks in the numerous plating tanks and how to recognize and correct problems relating to such procedures (initial Schulz Affidavit at ¶¶ 7-14).

not changed (other than the location of the plating tanks) are selective portions of the deposition testimony of Schulz, Desjardins (the general manager at Berkshire), Robles and Claudio. However, when fairly read in the context of their other testimony, none of the testimony cited by Claudio supports the conclusion that there has been no change in the nature of the jobs at Berkshire.

Claudio's references to the deposition testimony of <u>Schulz</u> do not support the fact that there have been no changes to the nature of the jobs at Berkshire. Thus, contrary to Claudio's SOFs, at deposition pages:

<u>9-10</u> (SOF 2), Schulz merely stated that he was the founder and is the sole owner of Berkshire and that he has been engaged in the business of polishing, buffing and plating plastic and metal parts for over 40 years.

<u>10-11 and 15</u> (SOF 3 and 6), Schulz merely stated that Berkshire has been in the business of polishing, buffing and/or plating parts since Berkshire's inception around 1985/6.

<u>17-18</u> (SOF 7), Schulz merely described some of the determinations which must be made in connection with placing a part on a rack, that he learned how to rack parts by watching other people and has been racking parts for 40 years.

<u>(21)- 22</u> (SOF 36), Schulz in fact testified as follows:

> Q. So I understand your answer, there are hundreds and hundreds of different categories of parts that you see on a regular basis?
> A. Yes.
>
> Q. Do each of those parts require a different process?
> A. Many of them do, yes.
>
> Q. How would somebody who was doing the plating know that?

6

> A. The two production ladies -- two production women would tell them what to do.
>
> Q. Okay. And has that changed over time.
> A. Yes.
>
> Q. Since when?
> A. It's been changing for fifteen, twenty years.
>
> Q. Please describe the changes over the fifteen, twenty years?
> A. No longer any long-run repetitive jobs. All short-run, fussy, technical jobs.
>
> Q. Describe the difference between long-run jobs and short-run jobs?
> A. Long-run jobs, we might do millions of pieces or tens of thousands. Short-run jobs, we might do one piece, we might do five, we might do fifty, we might do 100. [Schulz Deposition at 21-22].

(30)-31 (SOF 9), Schulz merely described some of the steps involved in plating a specific part, including the fact that the plating process involves immersing the racked parts in various chemical and rinse tanks, and stated that while the physical process of immersing the racked parts in the tanks is the same there are many adjustments which must be made for each tank.

37-38 (SOF 29), Schulz merely stated that the plating processes which he has done for 15 years are similar, described some of the plating tanks which are utilized and indicated that the plating tanks must be maintained, but also testified that "[e]very job is different" and "[t]here are hundreds of variations of that [plating] cycle".

Moreover and in addition to changes in the jobs which have occurred at Berkshire which are described in his affidavits (initial Schulz Affidavit at ¶¶ 18-21, 26-29 and Schulz Reply Affidavit at ¶¶ 3-4), at his deposition Schulz further testified as follows:

> Q. Any changes in racking and unracking during the years

Mr. Cotto was there?
A.  During the end of his time there, we didn't really have a racking and unracking function.  The platers racked their own and did more quality control work.  They didn't do just one thing.

Q.  When you say towards the end of his time there, you had already testified that he started plating in about 2000.  That is your best estimate?
A. Yes.

Q.  Is that what you're talking about?
A.  All through that period.

Q.  So starting around 2000?
A.  Well, actually, from the day he [Claudio] was hired, all the work was changing.

Q.  When you say all the work, what are you talking about?
A.  All the types of work that we had available to us was changing.  We were getting more small jobs, more short-run jobs, more complex jobs.  [Schulz Deposition at 89-90].

* * *

Q.  If at all, how did the functions for plating change from the year '97 through 2003.
A.  Number 1, we had a much more complex cleaning cycle.  The plater had to know specific instructions on many, many more jobs.  He had to have much more detail on quality requirements.  He had to be able to set amps and voltages in all the electric tanks.  Technical things like that.  I could name fifty more, but technical things like that.

Q.  What functions changed as a result of having more complex cleaning cycles?
A.  We started plating on more different base metals.

Q.  What would a plater need to do different than prior to the time that you were plating on more base metals?
A.  You would have to know the basic cycles for plating on more exotic metals.

Q.  Why did he have to know that?
A.  The parts would not come out right if he didn't know that.

Q. Starting when did your platers have to know the difference in cycles, starting what year?
A. About 2003. When we moved into the new building, it was all new equipment.

* * *

Q. I believe your testimony was that a plater had to know specific instructions.
A. Yes.

Q. Again, was this around '97 that the plater had to know more specific instructions.
A. Yes.

Q. And what has changed?
A. They had to be able to read process cards.

Q. Anything else?
A. They had to be a lot more responsible for their work.
[Schulz Deposition at 101-103].

* * *

Q. So you moved in 2003?
A. In just about the period he [Claudio] was laid off. We had no work at that time.

Q. Let me just go back then, because I misunderstood you. In '97, I believe you said that's when the more complex cleaning cycles arose or began to arise?
A. No, 2003.

Q. All right. And then -- but the amount to set the volts and amperage and electrolyte tanks that was over five years -- that began about five years ago?
A. We always had to do that, to some extent. But the platers, when we moved in, started taking much more responsibility to many, many changes.

Q. You said there was more changes to the plater's job over the last seven years than what you have already told me.
A. Yes.

Q. Would you tell me the rest?
A. They had to keep the PH of the tanks.

9

> Q. When did that start?
> A. We started paying more attention to that when we moved.
>
> Q. Is that when it started?
> A. No.
>
> Q. Okay. When did it start?
> A. It started like fifteen years ago. But we stopped it because platers wouldn't do it so the manager had [to] do it herself. You're making it sound like it's the simplest process in the world. It's tremendously complex * * * But there is a thousand variations is all I'm saying. [Schulz Deposition at 105-107].
>
> * * *
>
> Q. Anything else platers do? I'm asking specifically what functions have changed in the plater's job, after the last five years?
> A. They add organic addition agents to the tank to get the proper properties in the deposit.
>
> Q. And you said that's to change the properties of the chemicals?
> A. Yes.
>
> Q. When did they start doing that, the platers?
> A. When we moved into the new quarters. [Schulz Deposition at 108-109].

Claudio's references to the deposition testimony of <u>Desjardins</u> similarly do not support the fact that there have been no changes in the nature of the <u>jobs</u> at Berkshire. Thus, contrary to Claudio's SOFs, at her deposition pages:

<u>11</u> (SOF 16), Desjardins merely stated that she uses techniques today which are "similar" to the techniques she used to inspect parts for Remington shavers when she began working for Berkshire 20 years ago.

<u>26</u> (SOF 31 and 32), Desjardins merely testified that since the time she started

10

working for Schulz parts have been visually checked and that she learned how to visually check parts by watching Schulz, reading written instructions, listening to oral instructions from Schulz and by trial and error.

<u>30</u> (SOF 31 and 32), Desjardins merely stated that she had a ninth grade education and that since she first started working for Berkshire she and other workers at Berkshire have taught part inspectors how to do their job by showing them, orally telling them, giving them written instructions and having them read "cycle cards".

<u>40-44</u> (SOF 28 and 35), Desjardens merely testified that Jose Melendez was a head electroplater at Berkshire who was hired around 1995, that his job has been changing for "quite a few years" because it has "gotten a lot more technical", that Robles was a racker, plater, inspector and packager at Berkshire whose job has changed from longer run jobs to "shorter run jobs, so he had to be more versatile and go from job to job", and that Victor Rosado was a plater at Berkshire.

Moreover, at her deposition Desjardins also testified as follows:

> Q. Has his [Robles'] job changed over time.
> A. I'm sure it has.
>
> Q. How?
> A. They've gotten shorter run jobs, so he has to be more versatile and go from job to job. He might end up running quite a few different jobs a day.
>
> Q. And that was not the case when he first started plating?
> A. I don't believe so.
>
> Q. Do you not believe so, or are you relatively certain that he was doing longer run jobs?
> A. I can't remember. I believe he was doing a longer run job when he first started. [Desjardins Deposition at 43-44].

* * *

11

Q. I think you testified that his [Robles'] job changed and that it became more short-run jobs rather than long term jobs. Is that a correct characterization of what you said?
A. I believe so. [Desjardins Deposition at 45]].

* * *

Q. Did he [Claudio] need any different skills after -- I'm talking about now after the [long-term] Eaton job was over, did he need any different skills after that time until the time he was laid off in November 2003?
A. Well, the jobs had to have more skills. He had to know how to understand what we were telling him. He had to read papers, and things got very technical.

Q. And he was able to do his job, was he not?
A. Not that, not those. The only job he was actually doing was racking and unracking and doing some plating on this Dossert Corporation. That was what he was doing. He was racking another job, also; but then that job we didn't need him to rack anymore because the plater does it.

Q. He was able to do racking, though, correct?
A. Some racking, yes.

Q. Did the racking skills change over the seven years Mr. Cotto was at Berkshire.
A. Yes, because the parts themselves -- the jobs went and changed. I mean there's a lot more -- you have to know if a part has to be masked, you have to know if you've got the right rack, you have to know if the rack has be cleaned first. There are certain things you don't plate on a dirty rack and other things you can plate on a dirty rack. There's a lot more to know. [Desjardins Deposition at 56-57].

* * *

Q. Do you know why he [Claudio] was let go?
A. He was laid off.

Q. Who did that?
A. I did.

Q. Why was that?
A. Lack of work.

>Q. Why haven't you called him back?
>A. We still don't have enough work, and it's a totally different kind of work.
>
>Q. When did it become a totally different kind of work?
>A. I'm sorry -- it's different work now than when we always had before. It more technical, it's short-run jobs. Sometimes we get one piece. It's not something where we have long running jobs where we can have him come back.
>
>Q. When did that change?
>A. It had been changing for a long time.
>
>Q. Since the '90s?
>A. Yes. [Desjardins Deposition at 62].

Nor do Claudio's references to the deposition testimony of <u>Robles</u>, a racker and plater at Berkshire, support the conclusion that there have been no changes in the nature of the <u>jobs</u> at Berkshire. Thus, at his deposition pages:

<u>15-16, 24 and 68</u> (SOF 33 and 34), Robles merely testified that, other than the change in location of the plating tanks, he did not notice any changes in the jobs at Berkshire since 2003, including any changes with respect to the racking, plating, inspecting or packing of parts or the manner in which he received instructions, that the work he is now doing is "similar" to that which he did in November 2003 and that he has been laid off when the work at Berkshire was slow. However, such testimony is not inconsistent with the fact that <u>nature of the jobs</u> have become more complex, less repetitive and of shorter term with less parts. In any event, in his affidavit (Robles Affidavit at ¶¶ 4-6) Robles clarified that there has been a decrease in the number of jobs with large numbers of parts at Berkshire, that since around 2003/2004 he has been racking and plating new jobs which have less parts, last for shorter periods of time and are more complicated and that, because he primarily works alone, he does not really know what

the other employees at Berkshire were doing.

Moreover and consistent with his affidavit, at his deposition Robles confirmed that he did not know what other employees at Berkshire were doing and that the nature of jobs on which he works at Berkshire have in fact changed:

> Q. And you said the work at Berkshire never changed?
> A. I don't see nothing.
>
> Q. Do they [Berkshire] have the same customers now as they used to?
> A. I only do plating. I don't see who the new customers are.
>
> Q. So you don't know if they have any new customers, right?
> A. No, I don't work in the office. I don't know what is happening with the parts, I don't know what happens to the customers.
>
> Q. For instance, you don't know if they may have had a customer in 1996 and now no longer have that customer, right?
> A. I don't know.
>
> Q. And do you know whether Berkshire Manufacturing has the same amount of business now as it did in 1996 or '97?
> A. The amount of business?
>
> Q. Do you know, no?
> A. What do you mean, amount?
>
> Q. The volume of business. You just didn't articulate your answer, you shook your head. Do you know whether it has the same amount of business?
>
> \* \* \*
>
> Q. (By Mr. Aronson) Do you know if it has the same amount of business that Berkshire has now as it did in 1996?
> A. It's not the -- the same.
>
> Q. How do you know that?
> A. For me.

14

Q. For you?
A. Yes.

Q. But do you know whether or not overall or all of Berkshire whether it has the same amount of business let's say now as it did in 1996?
A. It's the same.

Q. Do you know, do you have any idea whether it's the same for all of Berkshire as opposed to just your work?

\* \* \*

A. For me, its the same. I don't know looking at the other person. I'm looking for me.

Q. So you know that your work is the same volume. Do you know whether Berkshire as a whole has the same volume of work or plates the same number of parts now as it did in 1996, do you know that?
A. I don't know, because ---

Q. You don't know, do you? And do you know if Berkshire is as profitable now as it was in 1996?
A. I'm going to ask you something. For me it's the same.

Q. So you don't know whether its more profitable or less profitable now; is that right?
A. Yes.

Q. And when you say you are doing the same work, are you now plating the same parts that you plated back in 1996?
A. No.

Q. The parts have changed, have they not?
A. The thing, I go to work. I'm not looking around the place if you are profit or not profit or if they got another customer or doesn't have a customer.

Q. You don't know who the customers are, right?
A. All of them, the thing is I go see Steve, gave me a job to-day, I do it. He told me what I'm going to do, I do it. The next day Don tells me do this, I do it.

Q. Right.
A. That is it. I'm not looking around the place.

Q.  So you don't know generally what other people are doing?
A.  No.

Q.  All you know is what you are doing?
A.  Yes, doing my job.

Q.  So are you still plating the same parts now that you were plating in 1996 or have they changed.?
A.  Changed. [Robles Deposition at 38-42].

\* \* \*

Q.  You got laid off in November of 2003?
A.  Yes, for a few weeks.

\* \* \*

Q.  How long were you laid off?
A.  About I think it was one or two weeks.  That is it.

Q.  And Mr. Cotto was laid off at the same time?
A.  I think so.

Q.  Do you know why you were laid off in November 2003?
A.  Because it was slow.

Q.  Lack of work?
A.  Yes. [Robles Deposition at 71].

\* \* \*

Q.  \*\*\* But you were laid off [for lack of work in November 2003], to your understanding, because the amount of work at Berkshire decreased?
A.  Yes, it went down. [Robles Deposition at 71].

\* \* \*

Q.  \*\*\* Now, when you got to Berkshire in October of 1995, there were certain jobs that you worked on, certain pieces that you did?
A.  Yes.

Q.  And are you still doing those very same pieces today, or

>    are they different pieces?
>    A. Different pieces.
>
>    Q. And do you know why you are not doing the same pieces that you did initially when you got to Berkshire in October of 1995.
>
>    * * *
>
>    A. I don't do the same part as when I started. The other part, I don't know what happened with the other part. I don't know.
>
>    Q. So the parts that you are working on now have changed from the parts that you were working on in October 1995, right.
>    A. They changed, yes. [Robles Deposition at 97-98].

Finally, the deposition testimony of and relied upon by <u>Claudio</u> merely indicates that Claudio believed that, during the period from 1997 (when he was hired) through 2003 (when he was laid off), the plating <u>process</u> (as opposed to the jobs) at Berkshire was the same (Claudio Deposition at 35-36) (SOF 30). Moreover, since Claudio primarily worked on the Simple Jobs at Berkshire (<u>see</u> the initial Schulz Affidavit at ¶¶ 17-19), there would, in fact, have been no change in the nature of the work which Claudio was doing and there is no basis for concluding that Claudio had any competent knowledge regarding the nature of the other jobs at Berkshire.

It is, therefore, submitted that Claudio has adduced no competent evidence that the nature of the jobs at Berkshire before and after 2003 have not changed by becoming more complicated/technical, less repetitive, shorter term and involving smaller numbers of parts, and that there is no genuine issue of material fact relating to the same.

**(C) It Is "Pure Conjecture" That Claudio Had Insufficient English Proficiency To Perform <u>The Work At Berkshire (After November 2003)</u>**

17

Initially it is submitted that Claudio has waived and should not be permitted to raise the issue of whether he was (is) able to understand the oral instructions in English which were necessary in order to perform the racking and plating work which existed at Berkshire as of and after November 2003.

As the Court may recall, Berkshire made a motion to compel Claudio to answer questions at his deposition (without translation into Spanish) regarding the oral instructions relating to the racking and plating procedures at Berkshire in order to determine whether he could understand them (and to confirm that Claudio could not understand such instructions for purposes of a potential motion for summary judgment).  The Court denied Berkshire's motion based on the representation of Claudio's counsel that Claudio would not be able to understand the instructions, and further indicated that it would be problematical to the Court if Claudio later adopted the position (as he now has) that Claudio could understand such instructions.

In any event, even without "linguistic training", by virtue of working with Claudio for 6 years Schulz is plainly competent to state that Claudio was not able to understand oral (or written instructions) in English regarding the racking and plating procedures at Berkshire (initial Schulz Affidavit at ¶16 and Schulz Reply Affidavit at ¶ 2).  Indeed, not only has Claudio admitted that he needed the assistance of translators in order to perform even the Simple Jobs he worked on at Berkshire prior to November 2003 (see Claudio Opposition Memorandum at 12), but at his deposition Claudio was plainly not able to understand even the most basic questions in English.  See, e.g., Claudio Deposition at 1-25.

Claudio did not testify as he claims that he "understood mostly all instructions given to him" by Desjardins, but rather that "[w]henever I understood them [Desjardins' oral instructions] I would go and do them.  And when I was in doubt, I would go and ask the guys."  (Claudio Deposition at 97) (SOF 45).  Nor did Robles ((Robles Deposition at 14) (SOF 45).  Robles did, however, confirm that he translated instructions for Claudio (Robles Deposition at 14 and 61-62) and, although Robles testified that he only translated for Claudio about 1 or 2 times a week, the reason was because "[s]ometimes he [Claudio] goes to other people to translate for him" (Robles Deposition at 61) (SOF 49).  In addition, Robles did not testify that he was most often the co-worker who was closest to Claudio (Claudio Opposition Memorandum at 12) (Robles Deposition at 65) (SOF 50) or that he "often" observed Claudio getting his assignments and doing his work without clarification or translation (Robles Deposition at 14) (SOF 52).  Finally, Desjardins did not testify as Claudio claims that Claudio only "occasionally" needed someone to translate for him (Claudio Opposition Memorandum at 12) (Desjardins Deposition at 88) (SOF 47).

Accordingly, even if he has not waived the issue, it is clear that Claudio is not capable of understanding the oral instructions in English relating to the work which existed at Berkshire in and after November 2003, and that there is no genuine issue of fact relating to the same.

**(D) Claudio Was Laid Off When Other Less
    Senior/Experienced Employees Were Retained**

As Schulz stated (initial Schulz Affidavit at ¶ 23), when Claudio was laid off in

19

November 2003 he was the least senior/experienced racker[5] at Berkshire.

Although it is not clear, it appears that Claudio is claiming that the employees who were retained when Claudio was laid off and had less racking experience than he were Katherine Corbin ("Corbin"), Carol Franck ("Franck") and Victor Rosado ("Rosado") (SOF 72).

However, while Corbin and Franck performed some racking functions, the primary job responsibility of both Corbin and Franck was administrative and managerial support, including (but not limited to) giving racking and plating instructions to employees[6], quality assurance, reading blueprints, determining process cycling for plating, processing orders, interacting with customers, answering the telephone, effecting computerized shipping, color buffing, assisting with cost and time management studies, measuring parts, masking parts and recording Baume solutions, all of which were jobs which Claudio could not do because of his limited ability to understand English.  See the Schulz Reply Affidavit (¶ 6) and Exhibit A to Berkshire's interrogatory answers (Exhibit J to Berkshire's Supplemental Exhibit Appendix).  Rosado was primarily a plater (whereas Claudio was a primarily a racker (supra)) and had been first employed at Berkshire in September/October 1995 (see Exhibit A To Berkshire's interrogatory answers (Exhibit J to Berkshire's Supplemental Exhibit Appendix)) or almost 2 years before Claudio was hired (see Schulz Reply Affidavit at ¶ 6) and, consequently, was senior to Claudio.

The deposition testimony of Schulz relied upon by Claudio does not state that

---

[5] Although he did some (5%) plating, Claudio was primarily a racker (initial Schulz Affidavit at ¶ 19, n3), and Claudio has admitted that he was hired as a racker (Claudio Deposition at 82).

[6] Contrary to Claudio's allegation, neither Robles nor Claudio testified that Corbin and Franck did not give them racking or plating instructions (Robles Deposition at 20-21) (Claudio Deposition at 154-155) (SOF 67).