Marcin Jandzis ("Jandzis") (infra) performed inspection, packing and racking duties, merely indicates that Cristobal Henriquez ("Henriquez") (infra) was a racker and does not state that either of them performed many of the same job duties as Claudio (Schulz Deposition at 138-140) (SOF 75).  In any event, Jandzis and Henriquez were hired after Claudio (see Exhibit B to Berkshire's interrogatory answers (Exhibit J in Berkshire's Supplemental Exhibit Appendix)) and, therefore, could not have been retained when Claudio was laid off.  The additional testimony of Schulz cited by Claudio merely states that Rosado was a plater (not a racker like Claudio), that Miguel Sanchez was a racker and packer (who was hired almost 2 years before and, therefore, was "senior" to Claudio (see Exhibit A to Berkshire's interrogatory answer (Exhibit J in Berkshire's Supplemental Exhibit Appendix)) and that, because he could understand English, the jobs performed by Henriquez were to only some extent similar to those of Claudio (Schulz Deposition at 64-69) (SOF 73).

     The testimony of Robles relied upon by Claudio refers to the job duties of Henriquez and Jandzis (Robles Deposition at 18-24) (SOF 64, 65, 66, 67 and 75), who, again, were hired after Claudio (supra) and, therefore, are irrelevant to the issue of who Berkshire retained when Claudio was laid off in November 2003.  And while Robles indicated that Corbin and Franck inspected, racked and packed parts, he clarified in his affidavit (Robles Affidavit at ¶ 7) and testified (supra) that he really did not know what the other employees at Berkshire were doing.  In any event, Robles also testified that Corbin and Franck performed jobs which Claudio did not:

> Q.  Just the receiving of material when they came in from customers, did [Corbin] do that?
> A.  Yes, sometimes.

Q. Did Mr. Cotto do that?
A. No.
Q. Did she open shipments when they came in?
A. Yes.

Q. Did Mr. Cotto do that?
A. No.

* * *

Q. Did she inspect polish work before it went to the had [sic] platers?
A. Yes.

Q. Did Mr. Cotto do that?
A. No.

* * *

Q. Did she keep records of extra heavy racks for extra pay for the platers?
A. Yes.

Q. Did Mr. Cotto do that?
A. No.

* * *

Q. Did she use [the] computerized shipping system?
A. Yes.

Q. Yes?
A. Yes.

Q. And did Mr. Cotto do that?
A. No.

* * *

Q. (By Mr. Aronson)  So you worked twenty feet from her [Corbin]?
A. Yes.  I don't know what she was doing.

Q. You don't know everything she did, do you?
A. No.

22

\* \* \*

Q. Did she ever work in the office section of Berkshire?
A. Right now?

Q. At any time?
A. Right now I see her a few days ago in the office.

Q. And did Mr. Cotto ever work in the office?
A. No.

Q. Now, those things that you just said that Kathy Corbin did, did Carol Frank also do the same things?
A. Yes.

Q. So she received incoming materials?
A. Yes.

Q. And she opened shipments?
A. Yes.

Q. And she sent parts to the polishing room?
A. Yes.

\* \* \*

Q. Do you know if she inspected the polish work?
A. Yes.

Q. And again Mr. Cotto didn't do that, right?
A. No.

\* \* \*

Q. Did she select purchase orders and keep track of them?
A. Yes.

Q. And did Mr. Cotto do that?
A. No. [Robles Deposition at 76-83].

\* \* \*

Q. By the way, did Kathy Corbin answer the telephone at Berkshire on occassion?
A. Yes.

23

> Q. Did Mr. Cotto do that?
> A. I don't see him, no.
>
> Q. And Carol Frank, did she ever answer the telephone at Berkshire?
> A. Yes.
>
> Q. And did Mr. Cotto ever do that?
> A. No. [Robles Deposition at 87].

Finally, the deposition testimony of <u>Claudio</u> merely refers to the layoffs of Claudio other than (and prior to) November 2003 or admits that Claudio was the least experienced ("newest") employee at Berkshire (Claudio Deposition at 103) (SOF 64 and 65), and Claudio stated that Corbin and Franck performed jobs other than he did (SOF 66).

It is, therefore, submitted that Claudio has adduced no competent evidence that he was laid off by Berkshire when other less senior/experienced rackers were retained, or that there exists a genuine issue of material fact relating to the same.

**(E) Berkshire Attempted To Fill Claudio's Position After He Was Laid Off In November 2003 And Berkshire Hired 3 Employees To Replace Claudio Who Were Not Hispanic And Not More Qualified Than Claudio**

As stated in the Schulz Reply Affidavit (¶ 7), after Claudio was laid off in November 2003, Berkshire did <u>not</u> attempt to obtain anyone to replace Claudio.

Although after Claudio was laid off Berkshire placed an advertisement in the newspaper for an "[a]ll around person to do inspection, packing & racking for plating shop" (Exhibit K in Berkshire's Supplemental Exhibit Appendix), the purpose of the ad was to obtain an employee who would be capable of performing the Complex Jobs which existed at Berkshire after November 2003 and which, because of his inability to understand oral instructions in English, Claudio could not do (Schulz Reply Affidavit at ¶

24

7).

In any event, no one was hired to replace Claudio (Schulz Reply Affidavit at ¶ 7), a fact confirmed by Robles (Robles Deposition at 90), and Schulz did not, as Claudio claims, testify that Berkshire hired anyone to replace Claudio (Schulz Deposition at 64-69 (SOF 74).

While it is not clear, it appears that Claudio is claiming that Elizabeth Gillette ("Gillette"), Jandzis and Henriquez were hired to replace him (SOP 73).

However, as set forth in the Schulz Reply Affidavit (¶ 8), the job responsibilities of Gillette, who was hired to replace Franck, included numerous administrative and managerial duties which required the ability to understand English (giving racking and plating instructions to employees, administrative support, including (but not limited to) quality assurance, reading blueprints, determining process cycling for plating, processing orders, interacting with customers, answering the telephone, effecting computerized shipping, color buffing, assisting with cost and time management studies, measuring parts, masking parts and recording Baume solutions). Jandzis was primarily hired to assist with the technical maintenance of the electroplating apparatus and tanks at Berkshire, including insuring that they were operating properly and had the correct amounts and mixtures of chemicals, jobs which Claudio did not, and because he was not able to understand oral instructions in English could not, perform. To the extent any racking or plating functions were performed by Jandzis, they related to the Complex Jobs at Berkshire which Claudio could not perform because of his inability to understand oral instructions in English. Henriquez, who was of Hispanic national origin but could understand oral instructions in English (Schulz Reply Affidavit at ¶8), was hired to rack the Complex

25

Jobs which, again, Claudio was not capable of doing because of his inability to understand oral instructions in English.

Contrary to Claudio's allegations, Schulz did not testify that either Gillette, Jandizis or Henriquez replaced Caudio, that either Gillette or Jandzis performed the same functions as Claudio, and merely stated that Henriquez was also a racker (with respect to the Complex Jobs (<u>supra</u>)) (Schulz Deposition at 64-69 and 138-140) (SOF 74 and 75).  And to the extent the testimony of Robles is inconsistent with the foregoing (Robles Deposition Testimony at 18-24) (SOF 64, 65, 66, 67 and 75), Robles has clarified that he does not know the extent of the job responsibilities of other employees at Berkshire (Robles Affidavit at ¶ 7).

It is, therefore, submitted that Claudio has adduced no competent evidence that Berkshire attempted to fill Claudio's position after he was laid off in November 2003 or that Berkshire hired any employees to replace Claudio who were not more qualified than Claudio, or that there is a genuine issue of fact regarding the same.

**(F)  There Is No Basis For Concluding That A Safety
Hazard Exists If Berkshire's Employees Are Not
<u>Able To Understand Oral Instructions In English</u>**

As stated in the initial Schulz Affidavit (¶¶ 6, 9-14), some of the plating tanks at Berkshire contain heated liquids/chemicals and/or hazardous and/or poisonous chemicals (such as sulfuric acid, hydrochloric acid, nitric acid, hydroflouric acid, potassium cyanide, sodium cyanide, chromic acid and sodium hydroxide) and if the proper sequence for the plating of parts is not correctly followed a plater could be burned either by the heat of or the acids contained in the plating tanks, and Desjardins confirmed that danger:

26

> Q. What are the reasons, as you understand them, for this requirement you've described [that it is necessary to communicate with employees by means of verbal or written instructions]?
> A. In plating you have a lot of dangerous chemicals that you're working with, and it's important that the people know just how to plate. If you're showing somebody how to do some plating and they're not plating properly, they could make a lot of people sick or you could ruin tanks by putting the wrong chemicals in the wrong tank.
>
> * * *
>
> Q. (By Ms. Garrow) Do you have anything else to add to what you've testified to?
> A. There's a good many jobs that we have there that if you're trying to tell somebody how to do and they don't do it properly, they could hurt themselves or others.[Desjardins Deposition at 79].

The fact that there have been no accidents at Berkshire or that Claudio was not involved in an accident (see Claudio Opposition Memorandum at 11) can not rationally negate the possibility that an accident could occur if an employee did not understand and follow the instructions relating to the plating process. Indeed, one of the reasons there have been no accidents at Berkshire is that all of the employees (with the exception of Claudio) understand oral instructions in English and, again, Claudio was only performing the simplest, most repetitive plating functions.

It is, therefore, submitted that Claudio has adduced no competent evidence that a safety hazard would not exist at Berkshire if an employee could not understand oral instructions in English, or that there exists a genuine issue of material fact relating to the same.

**(G) There No Basis For Concluding That It Is No Longer Possible For Bilingual Employees At Berkshire To <u>Translate Oral English Instructions Into Spanish</u>**

27

As Schulz stated (initial Schulz Affidavit at ¶¶ 27, 28 and 29 and Schulz Reply Affidavit at ¶ 4), because the jobs at Berkshire have become more complex, less repetitive, last for shorter periods and involve fewer parts, not only must rackers and platers be given instructions on a more frequent basis, but it is necessary to continuously monitor and give additional, supplemental instructions to insure that the racking and plating procedures are correctly performed.  As a result, it is no longer possible for Berkshire to utilize other bilingual employees at Berkshire to translate oral English instructions into Spanish for employees (like Claudio) who are not able to understand English instructions because that would prevent the translating employees from performing their own work for substantial periods of time, thereby significantly undermining the efficiency of the operations at Berkshire.

Contrary to Claudio's contention (Claudio Opposition Memorandum at 12 and 22), the fact that it was possible to have instructions translated for Claudio up through November 2003 is irrelevant since Claudio worked on the Simple Jobs which did not require extensive and continuing instructions and, once he learned relevant instructions, he was able to perform the Simple Jobs without the need for significant additional instruction (initial Schulz Affidavit at ¶¶ 16-19).  Nor is it inconsistent for Berkshire to claim that it did not have a sufficient amount of work for Claudio in and after November 2003 but that the bilingual employees do not have enough time to translate for Claudio.  It is not that Berkshire has a general "lack of work" (although in recent years the work has decreased substantially), but rather (as noted above) that Berkshire no longer has the type of Simple Jobs which Claudio can perform without being capable of understanding oral instructions in English.

28

Again Claudio has adduced no competent evidence that the efficiency of Berkshire's operations, or the work of the translating employees at Berkshire, would not be significantly, adversely affected if such translating employees were constantly required to translate oral instructions into English for Hispanic employees who (like Claudio) are not capable of understanding oral instructions in English with respect to the work which has existed at Berkshire since November 2003, or that there is a genuine issue of material fact relating to the same.

**(H) Claudio Was Qualified To Be A Racker (Plater) (In And After November 2003)**

As Schulz explained (initial Schulz Affidavit at ¶¶ 21-26), Berkshire no longer has a majority of the Simple Jobs which Claudio had worked on prior to November 2003 and/or the amount of work from such jobs has decreased substantially. Most of the jobs at Berkshire in and after November 2003 have been Complex Jobs which require that the rackers (and platers) be given continuous instructions to insure that the racking and plating is properly performed and it is no longer possible to have the bilingual employees at Berkshire translate oral English instructions in Spanish so that Claudio could perform the racking and/or plating functions for the Complex Jobs at Berkshire. Therefore, Claudio was not qualified to perform the racking and plating jobs which Berkshire has had in and after November 2003. Again, the fact that Claudio competently performed his work prior to November 2003[7] is irrelevant because, as noted above, up through November 2003 Claudio only worked on the Simple Jobs and, once he learned relevant

---

[7] Desjardins did not testify that "shortly into his tenure at Berkshire" Claudio was given plating responsibilities, but rather that when the Eaton job was lost (in or about November 2001 (see initial Schulz Affidavit at ¶18)) Claudio did some plating work because the work at Berkshire was slow and Berkshire was trying to keep Claudio busy (Desjardins Deposition at 49) (SOF 25).

29

instructions relating to the same, was able to perform the Simple Jobs without the need for significant additional instruction (initial Schulz Affidavit at ¶¶ 16-19).  Contrary to his allegation, Claudio did not testify that he was capable of racking all of the parts which were being plated at Berkshire in November 2003 (Claudio Deposition at 115) (SOF 56).

Therefore, once again Claudio has adduced no competent evidence that he was qualified to perform the work at Berkshire in and after November 2003, or that there is a genuine issue of material fact relating to the same.

**(I) <u>Summary</u>**

Based on the foregoing, it is submitted that there is no genuine issue with respect to the following facts:

(1)  Berkshire laid Claudio off in November 2003 because there were not enough Simple Jobs for him to do (lack of work).

(2)  Berkshire did not and has not admitted that Claudio was laid off because he could not understand English.

(3)  There were no less senior or experienced rackers/platers with the same qualifications as Claudio who were retained by Berkshire when Claudio was laid off in November 2003.

(4)  Prior to and since November 2003 the nature of most of the jobs at Berkshire has changed from Simple Jobs to the more Complex Jobs.

(5)  In order to correctly perform the racking and plating jobs at Berkshire, the rackers and platers must be given (primarily) oral instructions in English regarding the racking and plating procedures and the rackers and platers must be capable of under-

standing such instructions.

(6)  If the oral instructions with respect to the racking and plating procedures are not followed, the racking/plating jobs at Berkshire would not be correctly performed, platers could be seriously injured by the heat of and chemicals in the plating tanks and the plating tanks could be damaged.

(7)  Because most of the jobs at Berkshire in and after November 2003 have been Complex Jobs, the initial oral instructions with respect to such jobs must be given to rackers and platers on a much more frequent basis and additional, supplemental oral instructions must be continuously given regarding issues which arise during the racking and plating process.

(8)  Claudio is not able to understand oral instructions in English regarding the Simple Jobs or the Complex Jobs at Berkshire without having the instructions translated into Spanish for him.

(9)  Since the Complex Jobs at Berkshire require continuous instructions, it is no longer possible for bilingual employees at Berkshire to translate the oral instructions in English relating to such jobs into Spanish for Claudio without decreasing the efficiency of the operations at Berkshire because too much time would have to be spent translating the instructions which would decrease the time spent by the translating employees on their own work.

(10)  Because there have not been enough Simple Jobs at Berkshire since November 2003, Berkshire has not been able to rehire Claudio after November 2003.

(11)  Even if there had been enough Complex Jobs at Berkshire after November 2003 to warrant hiring him, Claudio was not qualified to perform the Complex Jobs be-

31

cause he is not able to understand the oral instructions in English relating to such jobs without the use of a translator.

(12) Berkshire has not admitted that it did not rehire Claudio after November 2003 because he could not understand English.

(13) Berkshire did not attempt to fill the position of Claudio after Claudio was laid off in November 2003.

(14) Berkshire did not replace Claudio after he was laid off in November 2003, much less with any employee who was equally or less qualified than Claudio.

For the reasons set forth below and based upon the foregoing facts, Berkshire is entitled to summary judgment.

### (2) CLAUDIO'S DIRECT EVIDENCE OF DISCRIMINATION

The only direct evidence that Berkshire illegally discriminated against Claudio on the basis of his Hispanic national origin is the statement in the March 29, 2004 letter from Schulz to the MCAD that the "problem ... [with Claudio] was his "lack of English" which (according to Claudio) establishes that Berkshire laid Claudio off in and failed to rehire him after November 2003 because of his Hispanic national origin.

As noted above, Berkshire laid Claudio off and did not rehire him because there were not enough Simple Jobs at Berkshire for him to do and he was not able to perform any Complex jobs, and Berkshire has not admitted that the reason Claudio was either laid off or not rehired was because of his lack of English.

Moreover, for the reasons set forth in Berkshire's initial Memorandum of Law (Section A), even assuming that Berkshire laid Claudio off and did not rehire because of a "lack of English" (or his inability to understand oral instructions in English), that would

32

<u>not</u> constitute direct evidence that Berkshire was illegally discriminating against Claudio on the basis of his Hispanic national origin because that statement could support the inference that (as was the case) Berkshire was merely limiting its employees to those individuals who could perform the Complex Jobs at Berkshire (which required the ability to be able to understand oral instructions in English) <u>regardless</u> of their national origin and, conversely, was not attempting to exclude employees of Hispanic (or any other) national origin. To the extent any cases cited by Claudio even address that issue (Claudio Opposition Memorandum at 5), they do not require a different conclusion.[8]

Therefore, even if (contrary to the facts) Berkshire had laid Claudio off or failed to rehire him based upon his "lack of English" or inability to understand oral instructions in English, that does not "directly reflect illegal animus" or discrimination against Claudio based upon his Hispanic national origin.

Accordingly, as a matter of law Claudio has not proffered any direct evidence that Berkshire illegally discriminated against Claudio.

### (3) <u>CLAUDIO'S CIRCUMSTANTIAL EVIDENCE OF DISCRIMINATION</u>

In his opposition papers Claudio does not dispute that his counsel previously represented to the Court that the <u>only</u> basis for his claim of discrimination in this action was the direct evidence that Berkshire laid Claudio off in and failed to rehire him after November 2003 based upon his "lack of English". In reliance on that representation Berkshire made its motion for summary judgment. Presumably because of the infirmities in

---

[8] Claudio has incorrectly characterized Berkshire's argument (initial Berkshire Memorandum Of Law at 18) by stating that the requirement that Claudio be capable of understanding oral instructions in English does not discriminate against individuals with an Hispanic national origin "because it also discriminates against people from France with limited English proficiency". The argument is that such a requirement would not be discriminatory because it would also exclude (for example) Americans who (for whatever reason) are not proficient in English.

his direct evidence case, Claudio has changed his theory and is now relying upon circumstantial (and direct) evidence to establish Berkshire's alleged discrimination.

Contrary to Claudio's claim, Berkshire does not maintain that a claim of discrimination can not be established by circumstantial evidence. Berkshire had merely assumed that Claudio was not proceeding on the basis of circumstantial evidence in accordance with the representation of his counsel.

Pursuant to <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973), and its progeny, a case of discrimination based upon circumstantial (as opposed to direct) evidence is generally analyzed within a three-part burden-shifting framework.

> At the first stage of the burden-shifting analysis, a plaintiff must establish a <u>prima facie</u> case of disparate treatment by a preponderance of the evidence. To do so, he generally must show that (1) he is a member of a protected class, (2) he was qualified for the job, (3) he suffered an adverse employment action, and (4) that the position remained open or was filled by a person with similar qualifications. \*\*\*
>
> \* \* \*
>
> Once the plaintiff makes a <u>prima facie</u> showing, the burden shifts to the defendant at the second stage of the analysis to produce a valid, non-discriminatory reason or reasons for the adverse action. \*\*\*
>
> At the third stage of the analysis, it becomes the plaintiff's burden to establish by a preponderance of the evidence "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. At the summary judgment stage, this means that the plaintiff "must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason was [national origin] discrimination. Put differently, the plaintiff "must produce evidence to permit a reasonable jury to conclude both that disparate treatment occurred and

34

> that the difference in treatment was because of [national origin].
>
> * * *
>
> *** "[T]he ultimate touchstone of the McDonnell Douglas analysis is whether the employer's actions were improperly motivated by discrimination.".

Quinones v. House Buick, 2005 U.S.Dist. LEXIS 14230, at *6 (D.Mass. July 14, 2005), aff'd, 2006 U.S.App. LEXIS 2568 (1st Cir. February 2, 2006).

For the reasons set forth hereinafter, however, Claudio is also unable to establish that Berkshire discriminated against Claudio on the basis of his Hispanic national origin by means of circumstantial evidence.

### (A)  CLAUDIO CAN NOT ESTABLISH A PRIMA FACIE CASE

### (i)  CLAUDIO'S DISCRIMINATORY TERMINATION CASE

In order to establish a prima facie case of discriminatory termination, Claudio must establish (among other things) that, after Claudio was laid off, Claudio's position remained open and that Berkshire attempted to fill or filled Claudio's position with someone who had qualifications which were similar to those of Claudio. Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15 (1st Cir. 1999); Feliciano De La Cruz v. El Conquistador Resort And Country Club, 218 F.3d 1 (1st Cir. 2000).

As noted above, Claudio was laid off because there was no longer enough work with respect to the Simple Jobs which Claudio had been performing at Berkshire for Claudio to do (and, therefore, Claudio's position did not remain open), Berkshire did not attempt to hire anyone to perform the Simple Jobs (as opposed to the Complex jobs which Claudio could not perform because of his inability to understand oral instructions

35

in English) and Berkshire did not hire anyone to perform the Simple Jobs at Berkshire, much less anyone with qualifications similar to Claudio's.

Accordingly, Claudio has failed to establish prima facie case of discriminatory termination as a matter of law.

**(ii) CLAUDIO'S DISCRIMINATORY FAILURE TO REHIRE CASE**

In order to establish a prima facie case of discriminatory failure to hire, Claudio must establish (among other things) that Claudio was qualified for a job which Berkshire was attempting to fill and that, after Claudio was rejected for the job, Berkshire attempted to fill or filled the job with someone who had qualifications which were similar to those of Claudio. Woods v. Friction Materials, Inc., 30 F.3d 255 (1st Cir. 1994); Fragante v. City And County Of Honolulu, 888 F.2d 591 (9th Cir. 1989).

As noted above, the only jobs which Berkshire attempted to fill after Claudio was laid off related to the Complex Jobs which Claudio was not qualified to perform because he was not able to understand oral instructions in English. In addition, the only employees hired by Berkshire after Claudio was laid off who Claudio claims had qualifications similar to his were Gillette, Jandzis and Henriquez. As noted above, however, Gillette performed numereous administrative and managerial duties, Jandzis performed duties relating to the maintenance of the plating tanks and apparatus and chemicals in the plating tanks and/or worked on the Complex jobs and Henriquez was hired to work on the Complex Jobs. Therefore, the jobs for which Gillette, Jandzis and Henriquez were hired were either not racking jobs or, because they required the ability to understand oral instructions in English, Claudio was not qualified to perform them. Accordingly, Berkshire did not attempt to fill and did not fill any position with employees whose quali-

36

fications were the same or similar to those of Claudio.

Accordingly, Claudio has failed to establish a prima facie case of discriminatory failure to hire as a matter of law.

### (B) BERKSHIRE HAD VALID, NON-DISCRIMINATORY REASONS FOR LAYING CLAUDIO OFF IN NOVEMBER 2003 AND FOR NOT REHIRING HIM AFTER NOVEMBER 2003

Assuming arguendo that Claudio could establish a prima facie case of discrimination, as previously noted, prior to November 2003 Claudio primarily racked and unracked the Simple Jobs at Berkshire. As of November 2003, both the number of these Simple Jobs, and the volume of the Simple Jobs which remained, at Berkshire had declined substantially and had been largely replaced by the Complex Jobs which required that rackers and platers be continuously instructed during the racking and plating processes. Berkshire, therefore, laid Claudio off in November 2003 because there was not enough work with respect to the Simple Jobs at Berkshire for him to do.

In addition, after November 2003 the number of Simple Jobs at Berkshire has not significantly increased to the point were Berkshire is able to rehire Claudio. And not only have the Complex Jobs similarly not increased, but even if they had Claudio would not be able to perform the racking (or plating) with respect to the Complex Jobs because of his inability to understand oral instructions in English and it is no longer possible for Berkshire to have other employees continuously translate such instructions into Spanish for Claudio.

Consequently, as a matter of law Berkshire had legitimate, non-discriminatory reasons for both laying Claudio off in and not rehiring him after November 2003.

37

### (C) BERKSHIRE'S REASONS FOR LAYING CLAUDIO OFF AND NOT REHIRING HIM WERE NOT PRETEXTUAL

Contrary to his allegations (Claudio Opposition Memorandum at 17), Claudio can not demonstrate that Berkshire's reasons for laying Claudio off in and not rehiring him after November 203 were pretextual, or not the "true reasons" for the lay off and failure to rehire.

As noted above, the statement by Schulz that the "problem [with Claudio] was in his lack of English" when read in the context of the entire paragraph of Schulz's March 29, 2004 letter to the MCAD referred to the fact that, because of his inability to understand oral instructions in English, it would have been difficult for Berkshire to hire Claudio with respect to any work relating to the Complex Jobs.

Although Claudio had adequately performed the Simple Jobs which existed at Berkshire prior to November 2003, as of November 2003 the number of and/or work with respect to the Simple Jobs had substantially declined and the Simple Jobs had been largely replaced by the more Complex Jobs.  And even if there had been enough racking (or plating) work in connection with the Complex Jobs to warrant rehiring Claudio, Claudio could not have (safely) performed the work because the Complex Jobs required that rackers and platers be continuously instructed throughout the racking and plating processes, Claudio could not understand oral instructions in English and it is no longer possible to have the instructions translated for Claudio by other employees if the operations of Berkshire are to remain efficient.

In addition, there was no one at Berkshire who was primarily a racker (like Claudio) but less experienced or senior than Claudio when Claudio was laid off in November 2003 (including Corbin, Franck and Rosado).  Nor did Berkshire attempt to fill Claudio's

position as a racker with respect to the Simple (as opposed to the Complex) Jobs and Claudio was not replaced by any other employee, much less by anyone who was equally or less qualified than Claudio (including Gillette, Jandzis and Henriquez).

Conversely, Claudio has not established that Berkshire's reasons for laying Claudio off and not rehiring him were weak, implausible, inconsistent, incoherent, contradictory or after-the-fact justifications. "[E]ven if a rational trier of fact could infer from the evidence of pretext that ... [Berkshire's laying Claudio off and not rehiring him] was 'unfair', that proof is not sufficient to state a claim under Title VII ... [because] Title VII was not designed to transform courts into 'super personnel departments, assessing the merits -- or even the rationality -- of employers' nondiscriminatory business decisions.' " Feliciano De La Cruz v. El Conquistador Resort And Country Club, 218 F.3d 1, 8 (1st Cir. 2000) (citations omitted).

Accordingly, as a matter of law Claudio has not established that the true reason for Berkshire laying Claudio off and not rehiring him was not because there was not a sufficient amount of work at Berkshire which Claudio was capable of performing.

**(D) CLAUDIO CAN NOT ESTABLISH THAT THE TRUE REASON BERKSHIRE LAID HIM OFF AND FAILED TO REHIRE HIM WAS BECAUSE CLAUDIO WAS HISPANIC**

Claudio has the:

> "ultimate burden ... to persuade the trier of fact that [he was] treated differently because of [his national origin]. On summary judgment, the question is whether plaintiff has produced sufficient evidence that he was discriminated against due to his national origin to raise a genuine issue of material fact. *** [E]ven if the trier of fact disbelieves the nondiscriminatory explanation given by the employer, the trier of fact is not compelled to find that the real reason was discrimination. That is because the ultimate question is not

39

> whether the explanation was false, but whether discrimina-
> tion was the cause of the termination.

<u>Zapata-Matos</u> v. <u>Reckitt & Colman, Inc.</u>, 277 F.3d 40, 45 (1st Cir. 2002) (citations omitted). As the Supreme Court stated in <u>Reeves</u> v. <u>Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120 (2000):

> "Certainly there will be instances where, although the plaintiff
> has established a prima facie case and set forth sufficient
> evidence to reject the defendant's explanation, no rational
> factfinder could conclude that the action was discriminatory.
> For instance, an employer would be entitled to judgment as
> a matter of law ... if the plaintiff created only a weak issue of
> fact as to whether the employer's reason was untrue and
> there was abundant and uncontroverted independent evi-
> dence that no discrimination occurred. [citations omitted].

It is submitted that when the totality of the evidence proffered by both parties in connection with this motion is fairly and objectively analyzed, it must be concluded that Claudio has, at best, merely raised a weak inference of discrimination based on the statement of Schulz in his March 29, 2004 letter to the MCAD that the "problem [with Claudio] was in his lack of English". However, as noted above and contrary to Claudio's primary argument, the fact that Berkshire had a problem with Claudio's "lack of English" simply does <u>not</u> mean that Berkshire's problem was that Claudio was of Hispanic national origin.

Claudio has, therefore, not produced sufficient direct and/or circumstantial evidence that Berkshire discriminated against him on the basis of his Hispanic national origin, particularly in view of the fact that Berkshire hired Claudio knowing he was Hispanic, Berkshire rehired Claudio after laying him off for lack of work at least 8 times before November 2003 and between 40 and 80% of the employees at Berkshire at any given time since 1997 have been of Hispanic national origin (<u>see</u> initial Schulz Affidavit

40